UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| RED ROCK SERVICES CO, LLC, | : | Case No. 07-21572REF |
| Debtor | : | |

-------------------------------------------------

| | | |
|---|---|---|
| ROBERT H. HOLBER, Esquire, | : | |
| Chapter 7 Trustee | : | |
| Plaintiff | : | |
| v. | : | Adversary No. 09-2112 |
| SUFFOLK CONSTRUCTION | : | |
| COMPANY, INC., | : | |
| Defendant | : | |

# **MEMORANDUM  OPINION**

# **I.  INTRODUCTION**

The Chapter 7 Trustee ("Trustee") of the bankruptcy estate of Debtor, Red Rock Services Co., LLC ("Red Rock"), initiated this construction litigation seeking to collect $1,667,945, plus attorneys' fees, costs and interest, from Suffolk Construction Company, Inc. ("Suffolk").  Trustee alleges that Suffolk refused or failed to pay Red Rock for certain demolition services provided to Suffolk in a construction project, known as the Silo Point project, near Baltimore, Maryland.

-1-

The second amended complaint filed by Trustee alleges causes of action against

Suffolk for breach of contract, or alternatively, breach of implied covenant of good

faith and fair dealing, breach of fiduciary duty, breach of constructive trust, unjust

enrichment and quantum meruit.[1]

Suffolk's answer to the second amended complaint sets forth several

affirmative defenses, including a setoff defense, and also requests attorneys' fees,

costs and interest arising from Red Rock's failure to perform its obligations in a

second construction project, known as the McCormack project, in Boston,

Massachusetts.

I find and conclude that Suffolk owes Trustee $1,156,909.46 for the

Maryland project and Red Rock owes Suffolk $852,201.83 for the Massachusetts

project. I also find that Suffolk may offset the amounts and reduce its obligation

to Trustee to $304,707.63.

---

[1] The second amended complaint filed by Trustee sought damages against Suffolk in the amount of $3,628,059.90, less any offset I might allow, plus attorneys' fees, costs and interest. These alleged damages arose out of two construction projects, known as the Silo Point project near Baltimore, Maryland, and the McCormack project in Boston, Massachusetts. Trustee has now reduced the amount of damages he is seeking to $1,667,945, as explained below. See Trustee's Proposed Conclusions of Law, filed on July 29, 2011 (docket entry 195) at 2 - 4. Prior to trial, Trustee abandoned his claims against Suffolk arising from the McCormack project by stipulating to dismiss Counts 7 through 10 of the second amended complaint. These counts sought to recover $600,000 in damages against Suffolk on alternative grounds. In addition, Trustee now concedes that Suffolk is entitled to be reimbursed for certain payments it made on behalf of Red Rock to Red Rock's subcontractors, vendors, and suppliers on the Silo Point project and to Terra Drilling, a subcontractor who completed Red Rock's work on the Silo Point project after Suffolk declared Red Rock in default.

# II.  JURISDICTION

The parties stipulated in their Joint Pre-Trial Statement that I have jurisdiction to hear this case under 28 U.S.C. §1334 and that the matter is a core proceeding under 28 U.S.C. §157(b)(2)(B).  <u>See</u> Joint Pre-Trial Statement filed on July 15, 2010 (docket entry 105), ¶1.  <u>See also</u> Joint Stipulation on the Court's Jurisdiction filed on August 29, 2011 (docket entry 203), ¶2.  The parties also stipulated and consented to my entry of a final judgment in this adversary proceeding.  <u>See</u> Joint Stipulation on the Court's Jurisdiction at ¶4.   I therefore find that this matter is a core proceeding over which I have jurisdiction and the power to issue a final decision pursuant to 28 U.S.C. §157(b)(2)(B).  This Memorandum Opinion constitutes my findings of fact and conclusions of law in this proceeding.

## III.  PROCEDURAL HISTORY

Trustee initiated this suit by filing a Complaint against Suffolk on May 18, 2009.  On June 15, 2009, the parties filed a Stipulation extending the deadline for Suffolk to respond to the Complaint to July 1, 2009.  I approved this Stipulation in an Order entered on June 17, 2009.  On June 29, 2009, Suffolk filed its Answer to the Complaint.

On September 22, 2009, I signed a Consent Order permitting Trustee to file a First Amended Complaint, which Trustee filed later that day.  Suffolk filed an Answer to the First Amended Complaint on October 1, 2009.  On March 5, 2010, Suffolk filed a Motion for Summary Judgment on Counts V, VI, VII and VIII of the First Amended Complaint ("Partial Summary Judgment Motion.")[2]  On April 2, 2010, Suffolk filed a Motion in Limine, and on this same day, Trustee filed a Motion for Leave to File a Second Amended Complaint.

On April 21, 2010, argument was heard on Trustee's Motion for Leave to File a Second Amended Complaint and on Suffolk's Motion in Limine and Partial Summary Judgment Motion.  On April 22, 2010, I entered an Order

---

[2] Suffolk had previously filed three separate summary judgment motions on February 23, 2010, which it consolidated into the single Summary Judgment Motion filed on March 5, 2010 after I entered a scheduling Order on March 4, 2010.

granting Trustee's Motion for Leave to File a Second Amended Complaint. I also

entered an Order on that same day deferring my consideration of Suffolk's Motion

in Limine until the time of trial.[3]

On April 23, 2010, Trustee filed his Second Amended Complaint and

on April 27, 2010, I entered an Order denying Suffolk's Partial Summary

Judgment Motion. Suffolk then filed an Answer to the Second Amended

Complaint on April 27, 2010. I conducted a Pre-Trial Settlement Conference on

July 21, 2010 and scheduled a twelve-day trial to commence on December 6,

2010.

On September 16, 2010, Suffolk filed a Praecipe to Relist its

Motion in Limine and on September 30, 2010, Suffolk filed a Motion in Limine to

Exclude Trustee's Expert from Testifying as to June 2007 Report. The parties

filed their briefs and I heard argument on Suffolk's Motions in Limine on October

25, 2010. At the conclusion of the argument, I entered a bench Order denying

Suffolk's first Motion in Limine without prejudice and on October 26, 2010, I

entered a written Order denying Suffolk's Motion in Limine to Exclude Trustee's

Expert from Testifying as to June 2007 Report.

---

[3] Prior to trial, Suffolk filed a Praecipe to relist the argument on the Motion in Limine. I
conducted argument on October 25, 2010, at which time I entered a bench Order denying
Suffolk's Motion in Limine without prejudice. See discussion at page 5, infra.

On November 24, 2010, Trustee filed a Motion in Limine to Preclude Defendant from Supplementing its Purported Claim for Setoff and/or Recoupment by $1,089,745.61 ("Claim Limine Motion"),[4] to which Suffolk filed a brief in opposition on December 1, 2010.  On December 2, 2010, I denied Trustee's Claim Limine Motion on the condition that:  (1) Suffolk:  (a) Pay for the pre-trial discovery and preparation expenses Trustee incurred relating to the $1,089,745.61 claim (not including attorneys' fees), and (b) immediately pay Trustee $50,000 as a retainer towards Trustee's pre-trial discovery and preparation expenses; and (2) the parties agree to continue the trial to dates mutually agreeable to them and the court.  I held a status conference on December 3, 2010, after which I entered a bench Order directing the parties to file any summary judgment motions on or before February 15, 2011,with responses to the motions due by March 12, 2011.  On December 9, 2010, I entered an Order canceling the trial dates previously scheduled and setting new trial dates.

On December 15, 2010, Trustee filed a Motion for Partial Summary Judgment, to which Suffolk filed an opposing brief and a Cross Motion for Summary Judgment on March 2, 2011.  I held a conference call later that day to

---

[4] The Claim Limine Motion was 21 pages in length and is more accurately characterized as a brief.

discuss Suffolk's untimely filing of its Cross Motion for Summary Judgment.  On

March 3, 2011, I entered an Order striking Suffolk's Cross Motion as tardily filed.

This Order made clear that Suffolk's Opposition to Trustee's Partial Summary

Judgment Motion remained pending.  On March 8, 2011, Suffolk filed a Motion

for Leave to File a Sur-Reply Brief In Opposition to Trustee's Motion for Partial

Summary Judgment, which I granted by Order entered that same day.  On March

14, 2011, Suffolk filed its sur-reply brief.  On March 21, 2011, I entered an Order

denying Trustee's Motion for Partial Summary Judgment and directing that trial

commence on April 4, 2011.  On March 28, 2011, Trustee and Suffolk filed a

Stipulation in which they agreed to dismiss Counts 7, 8, 9 and 10 of the Second

Amended Complaint.[5]

　　　　　Eight days of trial ensued, with the trial ending on May 17, 2011.

After the parties submitted proposed findings of fact, conclusions of law, and

proposed rebuttal and reply findings of fact and conclusions of law, I heard

argument on December 13, 2011.  I then took the matter under advisement.  After

reviewing the parties' submissions, I concluded that additional argument on

certain issues was necessary and I entered an Order on March 26, 2012 scheduling

---

[5] See page 2, n. 1, supra.

further argument on May 9, 2012.[6] Following this final argument, the parties

submitted final post argument submissions.   The matter is now ready for my

disposition.

---

[6] I entered an Order on May 13, 2012, that identified the issues to be addressed at the May 9, 2012 argument.

# IV.  FACTUAL BACKGROUND

Prior to filing this Chapter 7 bankruptcy petition, Red Rock was a construction subcontractor involved primarily in demolition work.  Suffolk is a construction general contractor.  In the summer of 2006, Suffolk was the general contractor on two projects, the Silo Point project located near Baltimore, Maryland, and the McCormack project located in Boston, Massachusetts.   Suffolk engaged Red Rock to serve as the demolition subcontractor on both projects.  This action arises from those two subcontracts and the work performed pursuant to them.

## A.  SILO POINT PROJECT

On April 20, 2006, Suffolk entered into a construction contract with the owner of the Silo Point grain bin, Silo Point II, LLC ("Silo Point ").  Under this contract, Suffolk served as the general contractor on the Silo Point project, which involved converting an 83-year-old grain silo into high-end condominiums. The contract between Silo Point and Suffolk was a Guaranteed Maximum Price contract ("GMP contract"), through which Suffolk guaranteed that the cost of the work plus its fee would not exceed $92,690,000, subject to additions and deductions authorized by change orders.

Suffolk engaged Red Rock to serve as the demolition subcontractor on the Silo Point project and the parties executed a subcontract for demolition services. This subcontract was dated as of July 24, 2006 ("Silo Point subcontract"). The Silo Point subcontract provided for Red Rock to be paid $2,060,000 to complete its work. Red Rock began demolition work on the Silo Point project in July 2006. During Red Rock's performance, Suffolk repeatedly complained to Red Rock about delays and various breaches by Red Rock. Furthermore, Suffolk was more or less forced to advance funds to pay Red Rock's employees, subcontractors, suppliers, and vendors. In fact, Red Rock accepted two deductive change orders - Deductive Change Order No. 00001 and Deductive Change Order No. 00002 - which reduced the original subcontract price to $2,054,483.[7]

On or about November 6, 2006, Red Rock was performing demolition work on several vertical storage bins that extended from below the 16th floor to the

---

[7] Suffolk advanced still more monies to Red Rock's subcontractors, suppliers, and vendors during the course of Red Rock's performance of the Silo Point subcontract. Suffolk also paid replacement subcontractors to repair and complete Red Rock's work on the Silo Point project. Suffolk was reimbursed for these advances and payments, however, in the settlement it reached with Silo Point. Suffolk therefore no longer seeks reimbursement of these advances and payments from the Red Rock bankruptcy estate. See Statement of Uncontested Facts, Exhibit J-59, at ¶¶42, 43, 45. To the extent I require that Suffolk remit to Trustee a portion of the funds it received from Silo Point, however, Suffolk will be entitled to a credit for these advances and payments. To rule otherwise would prejudice Suffolk and result in a windfall to Trustee.

18th floor. A portion of one of the bins detached from the structure and fell to the

15th floor, causing damage to portions of the existing concrete floor slab and walls.

Red Rock immediately ceased work after the bin collapse until the extent of the

damage could be assessed by the engineer of record and the project site was

declared safe for work to continue.

When Red Rock resumed work, it was required to change its method

of performance. Before the bin collapse, Red Rock intended to perform the work

using 80% mechanical demolition and 20% manual demolition. Red Rock had

based its bid on this demolition plan. After the bin collapse, Red Rock was

required to use 90% manual demolition and 10% mechanical demolition to

complete the demolition work. Manual demolition is obviously more expensive to

perform than mechanical demolition and this change in methodology increased

Red Rock's costs and slowed the pace of its demolition work.

On November 7, 2006, Suffolk provided written notice to Red Rock

of potential charges relating to the bin collapse. On November 8, 2006, and again

on November 10, 2006, Red Rock informed Suffolk that it would submit a claim

to its insurance carrier for the increased costs associated with the bin collapse. On

December 14, 2006, however, Red Rock informed Suffolk, through an email, that

it would submit a change order for the increased costs, claiming the bin collapse

was caused by an unforeseen condition (also known as a differing site condition).

This was the first notice Red Rock gave Suffolk of its intent to submit a change

order due to the bin collapse, despite the fact that Article 8.12 of the parties'

subcontract required that Red Rock give Suffolk written notice of any claim for

compensation for additional work within ten business days after the occurrence of

the event giving rise to the claim.

Red Rock formalized its submission of a claim for additional

compensation relating to the bin collapse in a letter to Suffolk dated December 20,

2006. On January 10, 2007, Red Rock submitted an invoice to Suffolk for

additional compensation in the amount of $1,046,440 to cover the increased

demolition work required by the bin collapse. Suffolk responded on January 11,

2007, requesting additional documentation and support for the claim. Suffolk did

not complain or give notice that Red Rock's request for additional compensation

was untimely. Meanwhile, Suffolk encouraged Red Rock to continue working at

the site while it was processing Red Rock's claim for additional compensation.

Red Rock therefore continued to work at the Silo Point site in anticipation of

being paid for the extra work required by the bin collapse.

Red Rock thereafter submitted to Suffolk Change Order No. 00001

dated February 15, 2007, which sought to increase the subcontract price by

$1,346,112. This change order included more detail and a breakdown of the

additional work Red Rock was required to perform resulting from the bin collapse.

Suffolk rejected this change order on February 27, 2007, claiming insufficient

supporting documentation and detail. Suffolk did not base its rejection on the lack

of timeliness of Red Rock's request for additional compensation. Red Rock then

submitted Change Order No. 00002, dated April 16, 2007, to Suffolk. This change

order, which supplemented Change Order No. 00001, was in the amount of

$585,398.40 and sought additional compensation for scaffolding costs. Suffolk

neither acknowledged nor rejected Change Order No. 00002.

　　　　In April of 2007, Suffolk and Red Rock executed a Memorandum of

Understanding[8] under which Red Rock agreed to abide by certain staffing

requirements and project completion dates at the Silo Point site and to provide

waivers of liens and proof of insurance to Suffolk. In return, Suffolk agreed to

provide Red Rock with reasonable cooperation in the preparation of the change

order claim resulting from the bin collapse and to make advance payments on

behalf of Red Rock to certain of Red Rock's subcontractors, vendors, and

suppliers. Red Rock then submitted Change Order No. 00003, dated June 27,

---

[8] The Memorandum of Understanding introduced and admitted into evidence as Joint
Exhibit J-30 is not dated. It contains a reference that it was dated in April 2007, but the date of
execution is blank.

2007 to Suffolk. Change Order No. 00003 superseded Change Order Nos. 00001

and 00002. Change Order No. 00003 sought to increase the contract price by

$2,692,624, thereby changing the original contract price from $2,060,000 to

$4,752,624. Change Order No. 00003 was supported by a report prepared by Hill

International ("the Hill Report"), the consultant retained by Red Rock to assist it

in preparing the change order. The Hill Report concluded: (1) Red Rock's

original bid and demolition plans for the Silo Point project were reasonable; (2)

the bin collapse was caused by a compensable unforeseeable differing site

condition; (3) the bin collapse caused Red Rock to incur an additional $2,692,624

in costs and expenses to complete the demolition work on the Silo Point project;

and (4) Owner (Silo Point) should be responsible for these additional costs and

expenses. Suffolk forwarded Change Order No. 00003 to Silo Point.

Silo Point denied Change Order 00003 on July 23, 2007, noting

several reasons to support the denial, including its belief that Suffolk submitted

the change order in an untimely fashion. According to Silo Point, Suffolk's

submission of the change order fell within Article 4.3.2 of the General Conditions

provisions of the contract executed between Silo Point and Suffolk, which

provisions required that all claims be initiated within 21 days after the occurrence

of the event giving rise to the claim. Silo Point contended that, because the bin

collapse occurred on November 7, 2006,[9] Suffolk's submission of Change Order

No. 00003 on July 12, 2007 was untimely. Silo Point also noted that under Article

8.12 of Suffolk's subcontract with Red Rock, Red Rock was required to submit its

claim to Suffolk within ten business days after the occurrence of the event that

gave rise to the claim. In addition, Silo Point concluded that Suffolk had

knowledge of the condition of the original structure, that Suffolk and Red Rock

warranted that they had sufficient information and detail to agree to the guaranteed

maximum price, that Suffolk and Red Rock breached their duties relating to site

examination and site safety, and that Suffolk was responsible for construction

means and methods and for the actions of its subcontractors. On August 3, 2007,

Suffolk transmitted Silo Point's denial of Change Order No. 00003 to Red Rock.

Suffolk responded to Silo Point's denial of the change order by sending a letter to

Silo Point dated October 15, 2007, in which it challenged Silo Point's conclusions

and decision and requested, on behalf of itself and Red Rock, a claims meeting

with Silo Point.

   Meanwhile, from July through August 2007, Suffolk provided Red

---

[9] Although Suffolk referred to November 7, 2006 as the date of the bin collapse, both
Suffolk and Red Rock agree that the bin collapse occurred on November 6, 2006. See Joint
Exhibit J-59, Statement of Uncontested Facts "Statement of Uncontested Facts"), ¶9;
Defendant's Proposed Findings of Fact filed on June 28, 2011 (docket entry 190) at ¶I(34);
Trustee's Proposed Findings of Fact filed on June 28, 2011 (docket entry 191) at ¶II (B).

Rock with several notices of back charges and insurance cancellation. On

September 6, 2007, Suffolk notified Red Rock that it was in default under the Silo

Point subcontract because Red Rock had abandoned the project. This notice gave

Red Rock 24 hours to remedy the default pursuant to Article 8.62 of the parties'

subcontract and provided that Suffolk would proceed with its rights under Article

8.62 if Red Rock failed to remedy the default within the 24-hour time period.

When Red Rock failed to remedy this default, Suffolk retained Terra Drilling to

complete Red Rock's work on the Silo Point project. On September 13, 2007, Red

Rock filed its Chapter 7 petition, initiating the underlying bankruptcy case.

Under Suffolk's GMP contract with Silo Point, Suffolk was entitled

to an equitable adjustment in the contract price or contract time if a differing site

condition caused an increase or decrease in Suffolk's cost or time to complete the

project. Shortly after Red Rock filed its Chapter 7 petition, John Fish, the owner of

Suffolk, contacted Rick Slosson, a representative of Silo Point, and advised him

that Suffolk intended to pursue Red Rock's differing site condition claim, as set

forth in Change Order No. 00003, against Silo Point, along with several other

claims. On January 18, 2008, Suffolk's counsel sent a letter to Mr. Slosson that

indicated, among other things, that Suffolk would pursue Red Rock's differing site

condition claim. On March 21, 2008, Suffolk sent a Request for Equitable

-16-

Adjustment (the "REA") in contract price and contract time to Silo Point.   The

REA included the Red Rock bin collapse/differing site condition claim and

attached the Hill Report as part of its proof in the submission.  Suffolk relied on

the Hill Report's analysis to support its request for reimbursement of the costs

incurred as a result of the bin collapse. The REA also included at least 57 other

claims.  The total amount sought in the REA was $14,337,395, of which 2,901,351

was based on the Red Rock bin collapse/differing site condition claim.[10]  The REA

also sought an extension of 255 days to complete the Silo Point project.

Silo Point initially rejected the REA.  On April 25, 2008, Suffolk

commenced a mechanic's lien action against Silo Point in the Circuit Court for

Baltimore County, Maryland.[11]  Suffolk again included the Red Rock bin

collapse/differing site condition claim, along with other claims, in its mechanic's

lien action.  Suffolk and Silo Point settled the mechanic's lien action in February

of 2009.  Suffolk received a total contract adjustment of approximately $9,991,231

from Silo Point through this settlement.[12]

---

[10] Change Order No. 00003 submitted by Red Rock to Suffolk sought an additional
$2,692,624 over the original subcontract price.  The REA submitted by Suffolk to Silo Point
attributed $2,901,351 to the bin collapse/differing site condition claim because it included certain
additional costs incurred by Suffolk in connection with the bin collapse.

[11] The mechanic's lien action was docketed in the Maryland court at Case No. 24-C-08-
02670.

[12] See Statement of Uncontested Facts, Joint Exhibit J-59, at ¶42.

## B.  MCCORMACK  PROJECT

Meanwhile, during this same general period of time, Suffolk also served as the general contractor on a project that involved the rehabilitation and construction of a federal office building in Boston, Massachusetts known as the McCormack Federal Office Building ("the McCormack project").  Suffolk retained Red Rock as the demolition subcontractor on the McCormack project and the parties executed a subcontract for the demolition work dated August 30, 2006.  The original subcontract price for the demolition work was set at $3,905,000.  The McCormack subcontract permitted Suffolk to deduct any amount Red Rock owed Suffolk under the McCormack subcontract from amounts Suffolk owed Red Rock under the McCormack subcontract or any other subcontract.  See Joint Exhibit J-44 at Article 8.17.5.

During the course of its performance of the McCormack subcontract, Red Rock repeatedly failed to provide Suffolk with documents and certificates of insurance required pursuant to the McCormack subcontract.  Red Rock was also behind schedule with its work.  Suffolk issued several notices to Red Rock concerning delays, safety issues, and failure to provide proper insurance.  Suffolk issued a formal notice of default under the McCormack subcontract to Red Rock on April 9, 2007.  On April 11, 2007, Suffolk issued a formal notice to Red Rock

-18-

terminating the McCormack subcontract. Suffolk thereafter engaged other

subcontractors to complete Red Rock's work on the McCormack project. Suffolk

seeks to offset the damages it incurred as a result of Red Rock's breach of the

McCormack subcontract from any amount to which Trustee might be entitled

under the Silo Point subcontract.

# V. LEGAL CONCLUSIONS

## A. DAMAGES OWED BY SUFFOLK TO TRUSTEE FOR BREACH OF SILO POINT SUBCONTRACT

### (1). Choice of law.

Trustee and Suffolk agree that Maryland law governs my decision on the issues raised under the Silo Point subcontract. See Joint Exhibit J-2 at Article 8.17.11. To prevail on a breach of contract claim under Maryland law, "a plaintiff must prove that the [d]efendant owed the [p]laintiff a contractual obligation and that the defendant breached that obligation." Davis v. Wilmington Fin., Inc., Civil No. PJM 09-1505, 2010 WL 1375363, at*6 (D. Md. March 26, 2010), citing Taylor v NationsBank, 776 A.2d 645, 651 (Md. 2001).

### (2). Red Rock substantially completed the Silo Point subcontract and Trustee is therefore entitled to damages in the net amount due under the original Silo Point subcontract - $442,627.

Trustee first seeks recovery of $442,627, which he claims represents the balance owed to Red Rock under the original Silo Point subcontract after subtracting the amount that Suffolk paid to Terra Drilling to complete Red Rock's work.

Both Trustee and Suffolk agree that if I find that Red Rock

substantially completed its scope of work under the Silo Point subcontract, Trustee

is entitled to recover damages for breach of contract.[13]  See Evergreen Amusement

Corp. v. Milstead, 112 A.2d 901, 905 (Md. 1955); Chlan v. KDI Sylvan Pools,

Inc., 452 A.2d 1259, 1262 (Md. Ct. Spec. App. 1982); Dept. of Housing and Cmty.

Development v. Mullen, 886 A.2d 900, 919-20 (Md. Ct. Spec. App. 2005).

> "It is a general rule that a party who has deliberately and
> wilfully breached a contract cannot recover thereunder
> for part performance." . . . The hardship of the rule
> requiring strict performance when applied to a contractor
> who, in good faith, has substantially performed
> compared to the inequitable advantage that it gives to an
> owner who receives and retains the benefit of the
> contractor's labor and material, has led to a qualification
> that the contract price, less allowance to the owner for
> deviations, may be recovered.  The question of whether
> there has been substantial compliance and whether a
> deviation from contract requirements is willful or
> justified, is ordinarily a question for the trier of the facts.

---

[13] Suffolk concedes that Trustee may recover damages if he establishes that Red Rock substantially completed its scope of work under the Silo Point subcontract. See Defendant's Memorandum of Law filed on July 29, 2011 (docket entry 194) at 9. Suffolk maintains, however, that Red Rock did not substantially complete the Silo Point subcontract and that Trustee failed to prove damages. Alternatively, Suffolk suggests that Trustee may not seek to enforce the Silo Point subcontract because Red Rock allegedly breached the parties' subcontract. As Trustee points out, even if Red Rock's alleged breaches were material, they would not automatically excuse Suffolk's payment obligation. A material breach does not automatically end a contract. The non-breaching party may choose between canceling the contract and continuing it, and if he elects to continue the contract, the obligations of both parties remain in effect. Howell v. State Farm Ins. Cos., 540 F. Supp. 2d 621, 629 (D. Md. 2008). Here, even if I were to find Red Rock's breaches of the Silo Point subcontract to be material, Suffolk elected to continue with the subcontract in the face of the breaches. The parties' Silo Point subcontract, therefore, remained in effect.

Evergreen Amusement, 112 A.2d at 906 (internal citation omitted).

> The cases are legion in applying the doctrine of substantial
> performance to building contracts.  The perfect tender rule
> . . . may be eminently fair in commercial transactions for goods,
> where if one party does not receive precisely what he bargained
> for, he may reject and return the goods, thereby restoring the
> status quo.  However, a construction contract is an inherently
> different beast.

Chlan, 452 A.2d at 1262.

Trustee offered the deposition of James Pierpont, a project executive

employed by Suffolk assigned to the Silo Point site ("Mr. Pierpont"), to support

his position that Red Rock had substantially completed the scope of its work on

the Silo Point subcontract when it left the job site and Suffolk declared it in

default.  Mr Pierpont testified that while it is difficult to take a "very cut and dry,

simple approach" to determine whether Red Rock had achieved substantial

completion when it left the Silo Point project because "they had started in certain

areas and they never completed it," he "would say that they were probably in the

range of, if you had to put a percentage on it, in the 90%" range of completing

their work on the Silo Point project when they left the job.  Notes of Testimony

("N.T.") April 5, 2011trial,filed on May 2, 2011 (docket entry 171), at 79:17 -

80:21.

Mr. Pierpont further testified that, after Red Rock left the Silo Point

-22-

project, Suffolk hired another demolition subcontractor, Terra Drilling, at a cost of

$129,876, to complete Red Rock's work. Id. at 79:8-16; 80:10-21. Mr Pierpont's

testimony was credible and straightforward and was corroborated by Jason

Goldberg, the President of Red Rock during the relevant period of time. Mr.

Goldberg testified that Red Rock was "95 to 97 percent complete" with its work

on the Silo Point project when it ceased working and that the only things

remaining to be performed were punch list items. N. T. April 4, 2011 trial, filed

on May 2, 2011 (docket entry 170), at 107:19-25. Based on this credible and

complementary testimony, I find that Red Rock had substantially completed the

Silo Point subcontract as of the time it left the job site.

Because Red Rock substantially completed its work on the Silo Point

subcontract, I agree with Trustee that he is entitled to damages in the amount of

$442,627. This sum represents the amount owed to Red Rock on the original Silo

Point subcontract after deducting the amount Suffolk paid to Red Rock and to

Terra Drilling to complete Red Rock's work and is explained in detail in the

following paragraph.

The original terms of the Silo Point subcontract provided for payment

to Red Rock of $2,060,000 for completion of its scope of the work. The parties

agreed to two deductive change orders, which totaled $5,517, and which reduced

the amount to be paid to Red Rock to $2,054,483. ($2,060,000 - $5,517 = $2,054,483). See Joint Exhibit J-19. Suffolk had paid Red Rock a total of $1,481,980 for the work Red Rock performed on the Silo Point project. Suffolk also paid Terra Drilling $129,876 to complete Red Rock's work after Red Rock left the job site. Subtracting the amount Suffolk paid to Red Rock and Terra Drilling ($1,481,980 + $129,876 = $1,611,856) from the total subcontract amount ($2,054,483) results in my finding that Trustee is entitled to damages in the amount of $442,627 ($2,054,483 - $1,611,856 = $442,627). See Trustee's Oral Argument Submission No. I, attached to this Memorandum Opinion as Addendum I.[14]

## (3). Suffolk breached the Silo Point subcontract by failing to honor Change Order No. 00003 after it settled its dispute with Silo Point.

Trustee next maintains that Suffolk breached the Silo Point

---

[14] Suffolk argues that I should deduct $719,101.66 from the amount Trustee claims he is owed on the original Silo Point subcontract to take into account the claim that Legendary Properties is pursuing in the Maryland courts against Suffolk's sureties. See N.T. May 9, 2012 Oral Argument at 24:13 - 26:17, Suffolk's Oral Argument Submission No. I, attached to this Memorandum Opinion as Addendum II. The parties agree that the Maryland trial court granted summary judgment in favor of the Suffolk sureties in this action and Legendary Properties appealed that decision. The appeal remains pending. Neither Suffolk nor Trustee discussed or analyzed, with citation to case law, statute, or court rule, the issue of how to treat Legendary Properties' claim in any of their submissions. I therefore find that the status quo controls at this time. Because Suffolk's sureties were granted summary judgment on the suit brought against it by Legendary Properties, no recognized claim exists. I therefore will not deduct the Legendary Properties claim from the amount Trustee is owed on the Silo Point subcontract.

subcontract by pursuing the Red Rock Change Order No. 00003 against Silo Point

and then failing to pay him the balance due on this change order after Suffolk

settled the matter with Silo Point and Suffolk received payment from Silo Point.[15]

Trustee argues that Suffolk's breach entitles Red Rock to recover the balance

owed to it on Change Order No. 00003 after: (1) Deducting the amount that

Suffolk paid to Red Rock's subcontractors, vendors, and suppliers on the Silo

Point project; and (2) crediting Red Rock with certain insurance proceeds Suffolk

recovered from Hartford Insurance Company.[16]  I agree with the bulk of Trustee's

analysis, but I find that additional sums must be deducted from Red Rock's

---

[15] Suffolk and Silo Point settled the mechanic's lien action after Red Rock filed this Chapter 7 petition and Trustee was appointed. Trustee therefore stands in the shoes of Red Rock and is entitled to any damages owed to Red Rock due to Suffolk's breach of the Silo Point subcontract.

[16] I had difficulty determining the basis in the record for the various figures bandied about by both parties because they failed to provide a solid basis to support them. The parties apparently had the same difficulty (at least in part). Trustee requested in his Memorandum of Law that the amount Suffolk paid to Terra Drilling be deducted from the $1,597,241 that Suffolk paid to Red Rock's subcontractors, vendors, and suppliers on the Silo Point project. Trustee claimed that Suffolk was already given credit for the amount it paid to Terra Drilling in my calculation of damages owed to Trustee based on Red Rock's substantial performance of the Silo Point subcontract. I disagree because I cannot find that Suffolk included the amount it paid to Terra Drilling in the $1,597,241 amount it requested for payment to Red Rock's subcontractors, vendors, and suppliers on the Silo Point project. See Suffolk's Oral Argument Submission No. 1, attached to this Opinion as Addendum II. Trustee acknowledged for the first time during the May 9, 2012 oral argument that he erred by requesting that the amount Suffolk paid to Terra Drilling be deducted from the $1,597,241 figure that Suffolk paid to Red Rock's subcontractors, vendors, and suppliers on the Silo Point project. Trustee then specifically admitted that his erroneous claim for damages based on Suffolk's failure to honor Change Order No. 00003 should be reduced by $129,876. N.T. May 9, 2012 Oral Argument at 20:23 - 21:13.

original $2,692,624 request in Change Order 00003 to reimburse Suffolk for

amounts it paid to other subcontractors to complete and repair Red Rock's work

on the Silo Point project. I also disagree with Trustee's argument that Red Rock is

entitled to a credit for the entire amount of the insurance recovery.

Mr. Pierpont testified that Suffolk had concluded, in July 2007 when

it sent Red Rock's Change Order No. 00003 to Silo Point, that the claim had

validity. N.T. May 11, 2011 trial, filed on June 2, 2001 (docket entry 184) at

152:7-153:11. He also testified that Suffolk would not have submitted the claim

to Silo Point if it thought it was invalid. Id. I find Mr. Pierpont's testimony in this

regard as persuasive.

After Silo Point denied Change Order No. 00003, Suffolk continued

to pursue payment from Silo Point for the costs and expenses itemized in Change

Order No. 00003, first in the form of the REA submitted to Silo Point on March

21, 2008, and after Silo Point rejected the REA, by way of the mechanic's lien

action. The REA submitted by Suffolk to Silo Point  specifically included a

differing site condition claim for the bin collapse, and sought recovery for the

increased cost and time incurred by Red Rock to perform the demolition work

because of the bin collapse. Statement of Uncontested Facts, ¶33. Suffolk took the

position in the REA that the bin collapse was neither foreseeable nor expectable

-26-

and that it was caused by a differing site condition. N.T. April 5, 2011 trial, at

40:14-17; Joint Exhibit J-56, Part 1, Narrative, at 8. Suffolk also alleged in the

REA that the bin collapse forced Red Rock to temporarily suspend its work on the

Silo Point project and to change its planned method of performing the work, which

resulted in an increase in the cost and time to complete the work.

As a result, Suffolk argued that Red Rock's additional costs should

have been paid and that Suffolk was entitled to an increase in contract time and

price in the amount of $2,901,351 to cover the cost of the bin collapse/differing

site condition claim. N.T. April 5, 2011 trial, at 41:5-22; Joint Exhibit J-56, Part

1, Narrative, at 9.[17] Suffolk attached the Hill Report to the REA to support its

request for compensation for the bin collapse/differing site condition claim.

Statement of Uncontested Facts, Exhibit J-59, at ¶34; Joint Exhibit J-56, Part 1,

Exhibit 3; N.T. April 5, 2011 trial at 103:6-14; N.T. May 11, 2011 trial, at 101:15-

20 and 137:4-22. After Silo Point rejected the REA, Suffolk filed the mechanic's

lien action against Silo Point, which demand for payment was based on Red

Rock's bin collapse/differing site condition claim (in addition to other claims).

Statement of Uncontested Facts, Joint Exhibit J-59, ¶37, 38. N.T. May 11, 2011

trial, at 92:4-6; 163:8-10. As stated earlier, Suffolk and Silo Point settled the

---

[17] See page 17, n. 10, supra.

mechanic's lien action in February of 2009, with Suffolk receiving a total contract

adjustment of approximately $9,991,231. Statement of Uncontested Facts, Joint

Exhibit J-59, at ¶42.

Based on these facts, I conclude that Trustee clearly established that

Suffolk owed Red Rock a contractual obligation to honor Change Order No.

00003, at least after it successfully pursued the claim against Silo Point.  I further

conclude that Suffolk breached that obligation by failing to pay Trustee the net

balance owed to Red Rock on the Change Order, after deducting amounts it paid

to other subcontractors, vendors and suppliers, once Suffolk received payment

from Silo Point.  Davis, 2010 WL 1375363, at *6; Taylor, 776 A.2d at 651.

Suffolk argues that Trustee may not recover under this theory because

Red Rock waived its claim for payment under Change Order No. 00003 by failing

to provide Suffolk with written notice of the claim within ten business days of the

bin collapse as required by Article 8.12 of the parties' subcontract.  I agree with

Trustee, however, that Suffolk waived its right to rely on the notice provision

found in Article 8.12 of the parties' subcontract and that Suffolk is equitably

estopped from claiming that Red Rock's notice was late.

### (a).  Suffolk waived its right to rely on the notice requirement in Article 8.12 of the parties' subcontract based on its conduct and the parties' course of dealing.

-28-

Parties to a contract may waive contract rights through their conduct or course of dealing. <u>Rea Constr. Co. v. State Roads Comm'n</u>, 174 A.2d 577, 579 (Md. 1961); <u>Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.</u>, 885 A. 2d 390-92 (Md. Ct. Spec. App. 2005). Course of dealing is defined under Maryland law as "a sequence of previous conduct between parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." MD. CODE ANN., COM. LAW, §1-205;[18] <u>see also</u> RESTATEMENT (SECOND) OF CONTRACTS: COURSE OF DEALING §223 (1981). The parties' course of dealing can act to waive a notice provision found in a contract. <u>City of Baltimore v. Poe</u>, 104 A. 360 (Md. 1918); <u>Merchants' & Miners' Transp. Co. v. Eichberg</u>, 71 A. 993, 994 (Md. 1909)(notice provision in bill of lading waived if a party's agent, with full knowledge of timeliness, did not raise objection to the claim on that ground). Whether the subsequent conduct of the parties amounts to a waiver is a question of fact to be decided by the trier of fact. <u>Kline</u>, 165 885 A.2d at 390.

Based on the evidence before me, I find Suffolk's conduct following

---

[18] MD. CODE ANN., COM. LAW, §1-205 was repealed on June 1, 2012 and replaced by MD. CODE ANN., COM. LAW §1-303(b), which states that "course of dealing" " is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Of course, the now-repealed language in old §1-205 controls in this case.

the bin collapse inconsistent with any intent to enforce the Article 8.12 notice of

claim requirement. The bin collapse occurred on November 6, 2006. Although

Red Rock initially advised Suffolk that it would be submitting a claim to its

insurance carrier to cover the damages associated with the bin collapse, as the

work progressed and it became apparent that the cause of the bin collapse was an

unexpected differing site condition, Red Rock notified Suffolk in writing on

December 14 and 20, 2006 that it would submit a change order to cover the extra

costs it would incur as a result of the bin collapse. Suffolk never complained about

the late notice. Instead, Suffolk repeatedly denied Red Rock's invoices and

Change Order No. 00001, not for lack of timeliness, but for lack of sufficient

documentation, detail, and support. Suffolk encouraged Red Rock to continue

working at the Silo Point site while its claim for additional compensation and

Change Order No. 00003 were processed. During the entire time Red Rock's

change orders were being processed by Suffolk, Suffolk never informed Red Rock

that its claim was untimely. In addition, in April 2007, the parties executed a

Memorandum of Understanding under which Suffolk agreed to cooperate with

Red Rock in the preparation and submission of a change order to Silo Point for the

extra costs and expenses Red Rock incurred due to the bin collapse. As a result,

Red Rock continued to work at the Silo Point project without being paid for the

extra costs and expenses.

After Change Order No. 00003 was submitted by Suffolk to Silo

Point and Silo Point asserted late notice as a defense, Suffolk asserted its belief

that it had not violated any notice provision and that its submission was timely.  In

fact, Suffolk's stance was that "[i]n the case of the bin collapse, considering that

the costs associated with the changed work continued through June 2007, it would

be unrealistic for Silo Point to expect RRS [Red Rock] to submit its cost proposal

prior to having a full accounting of those costs."  Trustee's Exhibit P-31 at SP-A-

007353 (letter from James Pierpont to Rick Slosson dated October 15, 2007); see

also N.T. May 11, 2011 trial, at 155:26-156:18.

In addition, with full notice that Silo Point had rejected the bin

collapse/differing site condition claim as untimely, Suffolk submitted the REA and

later filed the mechanic's lien action, including in both a request for compensation

for the Red Rock bin collapse/differing site condition claim.  In fact, in the

responses Suffolk provided to requests for admission in the mechanic's lien

action, Suffolk denied that it did not submit all of its proposed change orders

within the time prescribed by the contract.  Trustee's Exhibit P-44 at p. 21, No. 94

and pp. 24- 25, Nos. 106-110.  Specifically, in response to the following request,

"[a]dmit that Suffolk did not submit all of its proposed change orders within the

time limits set forth in Section 4.3 of the General Conditions of the Contract...,"

Suffolk responded, "Denied.  By way of further response, Suffolk states that the

parties' contemporaneous interpretation and course of conduct operated to

redefine the requirements of the Contract, including Section 4.3 of the General

Conditions of the Contract."   Id. at p. 21, No. 94.

Having reviewed the overwhelming evidence, I find that both

Suffolk's conduct and the parties' course of dealing show an intent on the part of

both Suffolk and Red Rock to waive the notice requirement found in Article 8.12

of the Silo Point subcontract.[19]

### (b). Suffolk is equitably estopped, based on its conduct, from claiming that Change Order No. 00003 was untimely under Article 8.12 of the Silo Point subcontract.

Based on the evidence outlined above, I also find that Suffolk is

barred, by the doctrine of equitable estoppel, from relying on Article 8.12 of the

---

[19] Suffolk maintains, relying upon a Massachusetts case that applied Massachusetts law, Earth Tech Env't. and Infrastructure, Inc. v. Perini/Kiewit/Cashman, No. 030566BLS, 2004 WL 2341397, at*4-5 (Mass. Super. Sept. 23, 2004), that the notice defense belonged to Silo Point, not Suffolk.  Suffolk argues, therefore, that it cannot be deemed to have waived the notice defense because this defense does not belong to it.  I find the Earth Tech case neither persuasive nor precedential because it applies Massachusetts law, and not the law of Maryland that I am bound to follow.  In addition, as Trustee points out, the court in Earth Tech reasoned that the "issue of raising a notice defense or waiver thereof was for [the owner], not [the general contractor] to assert." Id. at *4 (emphasis supplied).  Were I to apply the reasoning of the Earth Tech case to this case, I would find that Suffolk could neither waive the notice defense nor raise it to challenge Trustee's change order claim.

parties' subcontract to deny Change Order No. 00003 as untimely submitted.

Equitable estoppel prevents a party from asserting either property, contract, or remedial rights against another who relied on the person's conduct in good faith and was led to change his position to his detriment. <u>Catholic University of America v. Bragunier Masonry Contractors, Inc.</u>, 775 A.2d 458, 474 (Md. Ct. Spec. App. 2001). The elements of equitable estoppel are: "(1) [V]oluntary conduct or a representation by the party to be estopped, even if there is no intent to mislead; (2) reliance by the estopping party; (3) and detriment to the estopping party." <u>Id.</u> quoting <u>Holzman v. Fiola Blum, Inc.</u>, 726 A.2d 818, 832 (Md. Ct. Spec. App. 1999).

All of the elements of equitable estoppel have been met in this case. Suffolk's failure to advise Red Rock that it would raise the late notice defense and its denial of the change orders due only to lack of documentation and detail induced Red Rock to continue to work on the Silo Point project and to use more expensive and more time-intensive methods to complete the project. Relying on Suffolk's agreement to cooperate with Red Rock in the preparation and submission of a change order to Silo Point for the extra costs and expenses Red Rock incurred due to the bin collapse, Red Rock spent substantial money and effort to complete the project and to compile the documentation to support its bin

collapse/differing site condition claim, including hiring Hill International to

prepare the Hill Report to satisfy Suffolk's demands.  Adding insult to injury, after

denying Red Rock's bin collapse/differing site condition claim as set forth in

Change Order No. 00003, Suffolk pursued this claim against Silo Point, including

it in the REA and in the mechanic's lien action, and eventually received payment

for the claim from Silo Point, but never remitted any portion of this payment to

Trustee.  Based on these facts, I find that Suffolk is equitably estopped from

relying on the notice provision found in Article 8.12 of the parties' subcontract to

deny Red Rock's bin collapse/differing site condition claim as set forth in Change

Order No. 00003.[20]

### (c). Suffolk is equitably estopped from taking the position that the bin collapse was not caused by a differing site condition.

Based on the facts recited above, I also find that Suffolk is equitably

estopped from advancing the position that it should not be liable for Red Rock's

Change Order No. 00003 because the bin collapse was not caused by a differing

---

[20] I agree with Suffolk, however, that judicial estoppel is inapplicable to this case.  One of its essential elements -- that Suffolk's prior position (i,e., that the bin collapse was caused by a differing site condition and that Change Order No. 00003 was valid and entitled to be paid) must have been accepted by the court in the first proceeding -- is lacking here.  Reed Elsevier, Inc. v. Muchnick, 130 S.Ct. 1237, 1249 (2010), quoting New Hampshire v. Maine, 532 U.S. 742, 750 (2001).  The Maryland court never ruled on the propriety of the mechanic's lien action or the bin collapse/differing site condition claim because Suffolk and Silo Point settled the mechanic's lien action before the Maryland court had an opportunity to rule.

-34-

site condition. As I previously stated, Suffolk sought to recover from Silo Point

for the increased cost incurred as a result of the bin collapse, taking the position

that the bin collapse was caused by a differing site condition. To obtain this

recovery, Suffolk first submitted an REA to Silo Point. This REA included Red

Rock's bin collapse/differing site condition claim and attached the Hill Report.

Suffolk also included the bin collapse/differing site condition claim in its

mechanic's lien action against Silo Point. Having advanced the position that the

bin collapse was caused by a differing site condition to obtain a settlement from

Silo Point to cover the increased costs incurred by Red Rock as a result of the bin

collapse, Suffolk cannot now retreat from this position to avoid liability to Trustee

for the increased costs Red Rock incurred as a result of the bin collapse. To allow

Suffolk to take advantage of such a dubious tactic would simply be inequitable.

### (d). Red Rock did not waive its right to pursue Change Order No. 00003.

Suffolk argues that Red Rock waived its right to pursue Change

Order No. 00003 by failing to institute the dispute resolution procedures contained

in the Silo Point subcontract. I disagree. Despite multiple briefs and arguments,

Suffolk has not identified the provision of the parties' subcontract that required

that Red Rock invoke certain dispute resolution procedures within a defined time

-35-

frame to prevent a claim from being waived. To the extent Suffolk is arguing that

Red Rock was required to request a claims meeting, Mr. Pierpont testified that

Suffolk had requested a claims meeting with Silo Point after Silo Point rejected

Change Order No. 00003, see N.T. April 11, 2011 trial at 154:24 - 155:3, and the

letter sent by Mr. Pierpont to Silo Point requesting this claims meeting states that

the claims meeting was requested by both Suffolk and Red Rock. Trustee's

Exhibit P-31 at p. SP-A-007353.

Suffolk next tries to argue that Red Rock waived its right to pursue

Change Order No. 00003 by failing to notify Suffolk of cracks in the bins before it

installed steel plates and Hilti bolts. Again, I reject this argument. Suffolk

maintains that Red Rock's failure to notify it of these cracks violated Article 4.3.4

of the General Conditions of the Silo Point-Suffolk contract, which required that

twenty-one days notice be given of a subsurface or otherwise concealed or

unknown physical condition which differed materially from those ordinarily found

to exist. See Joint Exhibit J-1, General Conditions, Article 4.3.4. The Suffolk-

Red Rock subcontract (also referred to elsewhere in this Memorandum Opinion as

the Silo Point subcontract) required that Red Rock perform its work in accordance

with the contract between Silo Point and Suffolk, including the General

Conditions. See Joint Exhibit J-2 at Article 1. Suffolk failed to establish through

-36-

expert testimony, however, that the cracks in issue were subsurface or otherwise

concealed or unknown physical conditions that differed materially from those

ordinarily found to exist.   Furthermore, based on Suffolk's conduct and the

parties' course of dealing after the bin collapse, I find once again that Suffolk

waived its right to invoke this notice defense, see discussion at pages 28 - 32,

supra, and that Suffolk is equitably estopped from claiming that Red Rock should

have notified it of these cracks, see discussion at pages 32 - 35, supra.

**(e). Suffolk owes Trustee $714,282.46 in damages for breach of
contract based on Suffolk's failure to pay Trustee the balance due on Change
Order No. 00003 after Suffolk settled the mechanic's lien action with Silo
Point and received payment from Silo Point under the settlement.**

Having found that Suffolk breached the Silo Point subcontract when

it failed to remit payment to Trustee on Change Order No. 00003 after it received

payment from Silo Point on the settlement of the mechanic's lien action, I now

determine the amount of damages owed to Trustee to compensate Red Rock for

Suffolk's breach.

Trustee maintains that Suffolk's breach entitles him to recover

$1,247,237.65,[21] which represents the balance owed to Red Rock on Change Order

---

[21] Trustee maintained, in his Proposed Findings of Fact and Conclusions of Law, that he
was owed $1,225,318 on Change Order No. 00003.  See Trustee's Proposed Conclusions of Law
at 4 .  During the May 9, 2012 oral argument, however, Trustee conceded that he had made

No. 00003 after deducting the $1,597,241 that Trustee concedes Suffolk paid to

Red Rock's subcontractors, vendors, and suppliers to complete Red Rock's work

on the Silo Point project[22] and adding back $151,854.65, which represents the

amount that Trustee maintains Suffolk received from Hartford Insurance Company

to compensate it for losses it sustained as a result of the bin collapse. ($2,692,624

[amount sought by Red Rock in Change Order No. 00003] - $1,597,241 [amount

Trustee concedes Suffolk paid to Red Rock's subcontractors, vendors and

suppliers to complete Red Rock's work on the Silo Point project] + $151,854.65

[amount Trustee alleges Suffolk received from Hartford Insurance Company for

bin collapse losses = $1,247,237.65).

Suffolk disagrees with Trustee's damages calculation.  Suffolk

maintains that I should not use the full amount requested in Change Order No.

00003 as a starting point.  Instead, Suffolk maintains that certain charges included

by Red Rock in this Change Order were excessive.  Suffolk, however, relied upon

---

several errors when he initially calculated the amount owed to him on this change order.  First,
Trustee erred by excluding the amount Suffolk paid to Terra Drilling from the credit Suffolk was
owed for amounts it paid to Red Rock's subcontractors, vendors, and suppliers.  See page 25, n.
16, supra.  Second, Trustee failed to include the $151,854.65 that Suffolk received from Hartford
Insurance Company in his calculation of the amount owed to him on Change Order No. 00003.
See page 43, n. 27, infra.

[22] N.T. May 9, 2012 Oral Argument at 12:9-18.  These subcontractors were originally
retained by Red Rock to perform work on its behalf on the Silo Point project.

the full amount requested in the Change Order, and the Hill Report, when it both

submitted its REA to Silo Point and when it filed, and later settled, the mechanics'

lien action. To use any other figure as a starting point simply does not make sense

under these facts and would be inequitable.

Suffolk next maintains that additional sums must be deducted from

the $2,692,624 Red Rock requested in Change Order No. 00003 to reimburse

Suffolk for amounts it paid to other subcontractors to complete and repair Red

Rock's work on the Silo Point project.[23] In addition, Suffolk disagrees with

Trustee's argument that the total amount it received from Hartford Insurance

Company should be credited to Trustee.[24]

Suffolk argues that an additional $404,052.10 must be deducted from

---

[23] These contractors were retained by Suffolk after Red Rock abandoned the Silo Point
project to complete and repair Red Rock's work.

[24] Although Suffolk disagrees with the amounts that Trustee argues should be deducted
from and credited to the amount sought in Change Order No. 00003, Suffolk failed to advance an
alternative to the formula suggested by Trustee to quantify Trustee's damages arising from
Suffolk's failure to honor the change order. Settlement of the mechanic's lien action included
claims in addition to the claim based on Red Rock's Change Order No. 00003, but Suffolk failed
to prove that the settlement had been earmarked to indicate the portion of the settlement
attributable to each claim. Damages could be measured by pro rating each of the claims that
made up the settlement based on the amount of each claim. But Suffolk has neither advanced
this argument nor provided me with the amounts of each claim that had been aggregated in the
mechanic's lien action. Such information was absolutely necessary for me to make this
computation. As a result, I adopt the formula that was suggested by Trustee and adopted by
Suffolk.

the original $2,692,624 requested by Red Rock in Change Order No. 00003 to credit it for amounts it paid to other subcontractors to complete and repair Red Rock's work on the Silo Point project. See Defendant, Suffolk Construction Company, Inc.'s Reply Memorandum of Law, filed on August 15, 2011 (docket entry 199), at pp. 6-8; see also Suffolk's Oral Argument Submission No. I, attached to this Memorandum Opinion as Addendum II.[25] Specifically, Suffolk requests that $232,760 be deducted to credit Suffolk for monies it paid to other subcontractors to complete Red Rock's work on the Silo Point project, and that $171,292.10 be deducted to credit Suffolk for monies it paid to other subcontractors to repair defective work performed by Red Rock on the Silo Point project. See Addendum II, Suffolk's Oral Argument Submission No. 1.

Trustee argues that Suffolk is not entitled to these credits because it never forwarded deductive change orders to Red Rock. Trustee also maintains that Suffolk failed to prove its entitlement to the amounts sought in the deductive change orders. I find Trustee's arguments unpersuasive.[26]

--------

[25] These subcontractors were retained by Suffolk after Red Rock abandoned the Silo Point project to complete and repair Red Rock's work.

[26] Trustee also argues that the evidence shows that Red Rock substantially completed the Silo Point subcontract and that as a result, I should not consider Suffolk's deductive change orders for the amounts it paid to other subcontractors to complete and repair Red Rock's work. I disagree. While I did find that Red Rock substantially completed the Silo Point subcontract, Red Rock did not totally complete the Silo Point subcontract or complete it free of defects. Simply

Under Maryland law, "[t]he amount of damages recoverable for
breach of contract is that which will place the injured party in the monetary
position he would have occupied if the contract had been properly performed." In
re Cranston, 387 B.R. 480, 484-85 (Bankr. D. Md. 2008) quoting Hall v. Lovell
Regency Homes, Ltd. 708 A. 2d 344, 349 (Md. Ct. Spec. App. 1998). The primary
measure of damages in a breach of construction contract case is the cost of
repairing or remedying the defect. Id.

Suffolk breached the Silo Point subcontract by not forwarding a
portion of the settlement proceeds it received from Silo Point to Trustee. But
Trustee is not entitled to recoup the entire amount Red Rock sought in Change
Order No. 00003 because Red Rock abandoned the Silo Point project before

---

because Red Rock substantially completed the Silo Point subcontract does not mean that Suffolk
is not entitled to be reimbursed for the amount it paid to other subcontractors to complete and
repair Red Rock's work. As counsel for Suffolk aptly stated when discussing the propriety of
crediting Suffolk with the amount of these deductive change orders during the May 9, 2012, oral
argument,

> . . . one of the big sort of misconceptions that I think were [sic]
> operating here is that Red Rock's not entitled to get paid just to get
> paid. They actually have to perform the work and perform it
> correctly. They have to earn the money to get paid and I think
> we're glossing over this fact. They have to actually earn the money
> by performing the work on time and in accordance with the
> contract documents.

Transcript of May 9, 2012 Oral Argument filed on June 15, 2012 (docket entry 215), at 15:24 -
16:6.

completing its work and did not properly perform all of the work it had completed.

Instead, Suffolk must be credited with both the amount it paid to other subcontractors to complete Red Rock's work ($232,760) and the amount it paid to other subcontractors to repair Red Rock's defective work ($171,292.10). The question whether the deductive change orders were forwarded to and agreed upon by Red Rock is not controlling, although Mr. Goldberg testified that he recalled being issued deductive change orders by Suffolk and that some of them were signed by Red Rock, while many others were not. N.T. April 4, 2012 trial at 114:7-23. The fact of the matter is that Red Rock abandoned the Silo Point project without properly completing the work required of it under the subcontract. As a result, Suffolk was forced to retain other subcontractors to complete and repair Red Rock's work. Suffolk proved its entitlement to the amounts sought in the deductive change orders during the trial with the testimony of Bradley Dutton, a Project Manager employed by Suffolk, N.T. May 16, 2011 trial, filed on June 2, 2011 (docket no. 185) at 107:19 -115:9, through which the deductive change orders and supporting documentation were admitted into evidence. See Defendant's Exhibit 3, Silo Point RR Cos.

For these reasons, I credit Suffolk with both the amount it paid to other subcontractors to complete Red Rock's work ($232,760) and the amount it

paid to other subcontractors to repair Red Rock's defective work ($171,292.10). This result places both Trustee and Suffolk in the positions they would have been in had the Silo Point subcontract been properly performed. Cranston, 387 B.R. at 484-85. To rule otherwise on this issue would result in a windfall to Trustee, who stands in the shoes of Red Rock, because Red Rock would be collecting for work it either did not perform or work it performed in a substandard fashion. I will therefore credit Suffolk with an additional $404,052.10.

Finally, Trustee alleges in his Proposed Findings of Fact that Suffolk was paid $151,854.65 for certain claims it submitted to Hartford Insurance Company and requests that this amount be credited to him in this action. Trustee's Proposed Findings of Fact, filed on June 28, 2011 (docket entry 191) at p. 28, ¶148. I had originally believed that Trustee had abandoned this request because he failed to mention it in his subsequently filed Memorandum of Law or Reply Memorandum of Law. The figure requested as damages by Trustee in these legal memoranda does not include a request for the amount Suffolk allegedly received from Hartford Insurance Company.[27] Trustee did, however, press this item of damages at the May 9, 2012 oral argument.

---

[27] Trustee conceded during the May 9, 2012 oral argument that he had not included the $151,854.65 Hartford Insurance Company proceeds in any of his requests for damages. Transcript of May 9, 2012 Oral Argument at 21:7-13.

Suffolk takes issue with Trustee's position that he should be credited

with the total amount that Suffolk received from Hartford Insurance Company.

Suffolk concedes that it received $151,854.65 from Hartford Insurance Company,

but alleges that one-half of this amount ($75,927.33) was credited to Silo Point

under the mechanic's lien settlement agreement.  Suffolk further argues that only

$44,706.11 of the $151,854.65 relates to Change Order No. 00003, and was

intended as reimbursement for amounts Suffolk paid to Oncore Construction to

make repairs that were necessitated by the bin collapse.[28]  To the extent payment

of this $44,706.11 is duplicative of amounts that Suffolk is being credited with in

this action, Suffolk concedes that Trustee should be credited with one-half of the

$44,706.11.  N.T. May 9, 2012 Oral Argument at 7:1-4.

The record reflects that the entire $151,854.65 that Suffolk received

from Hartford Insurance Company was intended to compensate it for some of the

losses its incurred as a result of the bin collapse, and that one-half of this amount

($75,927.33) was credited to Silo Point under the parties' settlement of the

mechanic's lien action.  Mr. Slosson testified during his deposition that the entire

$151,854.65 received from Hartford Insurance Company was intended as

---

[28] The $44,706.11 portion of the proceeds was paid to Suffolk to compensate it for
payments to Oncore Construction for work arising from the bin collapse.

-44-

compensation for losses that related to the bin collapse. See N.T. April 5, 2011

trial, at 55:18-23, 56:7-9. In addition, the chart attached to the February 6, 2008

letter from Hartford Insurance Company to Silo Point indicates that the date of

loss for this insurance claim was November 6, 2006, which is the date of the bin

collapse. See Trustee's Exhibit P-36 at SP0017338.[29] Mr. Slosson further

testified that one-half of the $151,854.65 was credited to Silo Point under the

parties' settlement of the mechanic's lien action. See N.T. April 5, 2011 trial, at

56:10 - 57:12.

Simply because the entire $151,854.65 insurance recovery arose from

the bin collapse does not mean that Trustee is entitled to a credit for the entire

amount or even half of the amount. Trustee's theory of recovery under this

portion of his breach of contract claim is based upon Suffolk's failure to honor

Change Order No. 00003, which Red Rock had submitted to Suffolk for excess

costs Red Rock incurred as a result of the bin collapse. Trustee can not blindly

latch on to the $151,854.65 insurance proceeds to supplement the amount

---

[29] Although neither party raised this issue, I noticed when reviewing the chart included in
Trustee's Exhibit P-36 that a $10,000 deductible was withheld from the $151,854.65 insurance
proceeds paid out by Hartford Insurance Company and that the net amount paid out on this claim
was $141,854.65. See Exhibit P-36 at SP0017338. Because neither party raised any issue
relating to a possible $10,000 deductible, and because no testimony or exhibits elicited during the
trial referred to it, I will not address it. This is particularly because Suffolk, the party who would
benefit from the deductible, failed to raise it at trial, during argument, or in its briefs.

-45-

requested in this Change Order without proving a link between the insurance proceeds and Change Order No. 00003.

I first analyze the $11,710.79 portion of the $151,854.65 insurance recovery that is earmarked as reimbursement for Suffolk staff. Clearly, Trustee proved no link between the $11,710.79 that Suffolk received from Hartford Insurance Company to reimburse it for paying its own staff and Change Order No. 00003. Indeed, Red Rock could not, and did not, include Suffolk's staff's costs in the request for additional compensation it made in Change Order No. 00003 because this was an expense incurred by Suffolk, not by Red Rock. Trustee's request to be credited with $11,710.79 of the insurance proceeds must be denied.

I next address the $77,235.78 portion of the $151,954.65 insurance recovery that is earmarked as reimbursement for work performed by Red Rock Services relating to the bin collapse. Presumably, Red Rock included a claim for this work in Change Order No. 00003. Trustee has not established why crediting him with this amount will not result in double dipping with Trustee receiving credit/payment for the same work twice. Trustee's request to be credited with $77,235.78 of the $151,954.65 insurance recovery must be denied.

I next address the portion of the $151,954.65 insurance recovery that is earmarked as reimbursement for amounts paid by Suffolk to Oncore

-46-

Construction for repairs made by Oncore that were necessitated by the bin collapse. Suffolk concedes that Trustee is entitled to a credit of one-half of the insurance recovery earmarked as reimbursement for amounts paid to Oncore Construction to the extent that the recovery is duplicative of amounts for which Suffolk is seeking a credit in this action. N.T. May 9, 2012 Oral Argument, filed on June 15, 2012 (docket entry 215), at 7:1-4. Suffolk advised during oral argument that the only portion of the insurance recovery that related to Oncore Construction was the amount listed as Concrete Repairs (Oncore) $44,706.11. N.T. May 9, 2012 Oral Argument at 6:19-22. Suffolk made this representation based on Trustee's Exhibit P-36 at SP0017338.

My review of this exhibit, however, reveals that $45,903.11 of the insurance recovery relates to work performed by Oncore Construction. Specifically, as Suffolk represented, the exhibit identifies $44,706.11 as reimbursement for Concrete Repairs (Oncore). But the Exhibit also identifies $1,197 as reimbursement for Loss of Productivity (Oncore). Suffolk failed to explain how this $1,197 portion of the recovery is different from the $44,706.11 portion of the recovery. Both relate to Oncore Construction and both were included in deductive change orders issued by Suffolk to Red Rock for payments made by Suffolk to other subcontractors to repair Red Rock's work. In fact,

-47-

Suffolk included both of these deductive change orders in its $171,292.10 credit request in this action for amounts it paid to other subcontractors to remedy Red Rock's defective work. See Defendant's Exhibit 3, Silo Point RR Cos, Deductive Change Order No. 00003, Deductive Change Order No. 00013, Deductive Change Order No. 00014; see also Addendum II, Suffolk's Oral Argument Submission No. I. I therefore find that Trustee is entitled to a credit of $22,951.56, which represents one-half of the $45,903.11 that Hartford Insurance Company paid to compensate Suffolk for amounts Suffolk paid to Oncore Construction.[30]

The final portion of the $151,854.85 insurance recovery that must be

---

[30] As I stated earlier, Trustee's request for damages under this portion of his breach of contract claim is based on Suffolk's failure to honor Change Order No. 00003. I decided above that Suffolk breached its subcontract with Red Rock when it failed to honor Red Rock's Change Order No. 00003 upon settlement of its mechanic's lien action with Silo Point. I did not, however, award damages based upon the entire amount of Change Order No. 00003. Instead, I determined that Suffolk was entitled to a credit, among other credits, in the amount of $171,292.10 for amounts it paid other subcontractors to repair Red Rock's defective work. See discussion at page 42 - 43, supra. Included in the $171,292.10 was $74,169 that Suffolk had paid to Oncore Construction to remedy Red Rock's defective work. See Defendant's Exhibit 3, Silo Point RR Cos, Deductive Change Order No. 00003, Deductive Change Order No. 00013, Deductive Change Order No. 00014; see also Addendum II, Suffolk's Oral Argument Submission No. I. Suffolk agrees that allowing it to receive a credit for the $74,169 it paid to Oncore Construction to remedy Red Rock's defective work, while also allowing it to keep the $22,951.56 which it received from Hartford Insurance Company to compensate it for part of the money it paid to Oncore Construction Company for this same work, would result in a windfall to Suffolk because Suffolk would be getting reimbursed for this same work twice. Crediting Trustee with $22,951.56 places both Trustee and Suffolk in the positions they would have been in had the Silo Point subcontract been properly performed. Cranston, 387 B.R. at 484-85. Because the evidence established that one-half of the $151,854.65 insurance recovery was credited to Silo Point under the parties' settlement of the mechanic's lien action, see N.T. April 5, 2011 trial, at 56:10 - 57:12, I will only credit Trustee with $22,951.96, which represents one-half of the $45,903.11 insurance recovery earmarked for claims related to Oncore Construction.

addressed is the $3,200 earmarked for Engineering. No evidence was presented to

explain the details of this portion of the recovery and neither party addressed this

portion of the recovery during oral argument or in their briefs. I therefore find that

Trustee has not met his burden of showing how this $3,200 recovery is linked, or

in any way related, to his request for payment on Change Order No. 00003.

Trustee's request to be credited with this $3,200 of the insurance proceeds must be

denied.

I now turn to the calculation of damages owed to Trustee arising from

Suffolk's breach in failing to honor Change Order No. 00003. I begin by noting

that Change Order No. 00003 submitted by Red Rock to Suffolk requested

additional compensation of $2,692,624. Trustee agrees that Suffolk is entitled to a

credit for the $1,597,241 Suffolk paid to Red Rock's subcontractors, vendors and

suppliers on the Silo Point job project. Joint Exhibit, J-57, Part 3, Summary

Vendor Payments, p.1, N.T. April 5, 2011 trial at 81:2-19.[31]   As I explained

above, Suffolk is also entitled to a credit in the amount of $404,052.10 for the

amount it paid to other subcontractors to complete and repair Red Rock's work

---

[31] Trustee does not dispute that Suffolk paid $1,597,241 to Red Rock's vendors,
suppliers, and subcontractors on the Silo Point project. But Trustee had incorrectly suggested
(until May 9, 2012) that the $1,597,241 figure includes the $129,876 amount that Suffolk paid to
Terra Drilling to complete Red Rock's work on the Silo Point project. As I explained in footnote
16, supra, this suggestion is incorrect and Trustee conceded that he was incorrect during the May
9, 2012 oral argument.

after Red Rock abandoned the Silo Point project.[32] See discussion at pages 39 -

43, supra. Subtracting the amount Suffolk paid to Red Rock's subcontractors,

vendors and suppliers on the Silo Point project ($1,597,241) and the amount

Suffolk paid to other subcontractors to complete and repair Red Rock's work on

the Silo Point project ($404,052.10) from the total amount of Change Order No.

00003 submitted by Red Rock to Suffolk ($2,692,624) results in a net damage

award in favor of Trustee in the amount of $691,330.90. ($2,692,624 - $1,597,241

= $1,095,383 - $404,052.10 =$691,330.90).

In addition, Trustee is entitled to a further credit in the amount of

$22,951.56, which is one-half of the Hartford Insurance Company proceeds that

relate to the Oncore Construction claim. See discussion at pages 43 - 49, supra.

Adding this $22,951.56 to the $691,330.90 net damage award results in my

finding that Suffolk owes Trustee $714,282.46 on Red Rock's Change Order No.

00003. ($691,330.90 + $22,951.56 = $714,282.46).

## 4. Final calculation of Red Rock's damages.

Suffolk owes Trustee $1,156,909.46 in total damages for (i) breach of

contract — Suffolk's failure to pay Trustee the balance due on the original

---

[32] Suffolk retained these subcontractors after Red Rock abandoned the Silo Point project.

subcontract upon Red Rock's substantial performance ($442,627) and (ii) breach

of contract — Suffolk's failure to pay Trustee the balance due on Change Order

No. 00003 after Suffolk  settled the mechanic's lien action with Silo Point and

received payment from Silo Point under the settlement ($714, 282.46).  ($442,627

+ $714, 282.46 = $1,156,909.46.)

## B.  TRUSTEE'S ALTERNATIVE CAUSES OF ACTION ON SILO POINT SUBCONTRACT

Because I find that Suffolk is liable to Trustee for breach of contract,

I need not analyze the alternative causes of action advanced by Trustee in his

Second Amended Complaint.  These alternative causes of action, which seek

recovery for the same amounts Trustee was seeking to recover in his breach of

contract claim, allege breach of implied covenant of good faith and fair dealing,

breach of fiduciary duty, breach of constructive trust, unjust enrichment and

quantum meruit.

# C.  DAMAGES OWED BY RED ROCK TO SUFFOLK UNDER MCCORMACK SUBCONTRACT

## (1).  Introduction.

Having determined that Suffolk is liable to Trustee for damages as a result of Suffolk's breach of the Silo Point subcontract, I next address Suffolk's contention that it is entitled to an award of damages against Trustee arising from Red Rock's breach of the McCormack subcontract.  Suffolk argues that it may offset these damages against the damages I awarded to Trustee due to Suffolk's breach of the Silo Point subcontract.

## (2).  Choice of law.

Massachusetts law governs my decision on any state law issue that arises under the McCormack subcontract.  See Joint Exhibit J-44 at Article 8.17.11.

## (3).  Red Rock breached the McCormack subcontract.

To prevail on a breach of contract action under Massachusetts law, Suffolk must prove that: (1) The parties entered into a contract supported by valid consideration; (2) Suffolk was ready, willing and able to perform the contract; (3) Red Rock breached the contract; and (4) Suffolk suffered damages as a result of

the breach. <u>Singarella v. City of Boston</u>, 173 N.E.2d 290, 291 (Mass. 1961).

Suffolk has proven all of these elements. A contract supported by valid consideration existed between Suffolk and Red Rock in the form of the McCormack subcontract. Suffolk was ready, willing and able to perform its obligations under the McCormack subcontract. Red Rock breached the McCormack subcontract by: (1) Repeatedly failing to provide Suffolk with documents, certificates of insurance and performance and payment bonds, all of which were required by the McCormack subcontract; (2) failing to perform its work in accordance with the contract documents; (3) failing to comply with the subcontract requirements regarding safety; (4) failing to pay its vendors, subcontractors, workers and union benefit funds, as required by the subcontract requirements; and (5) failing to progress and complete its work in compliance with the subcontract schedule thereby causing substantial delays. As a result of these breaches, Suffolk terminated Red Rock on the McCormack subcontract and hired other subcontractors to complete Red Rock's work. This led to Suffolk incurring damages in the form of additional costs to complete the subcontract and repair Red Rock's defective work, which Suffolk now seeks to recover from Trustee.

**(4).  Suffolk met the burden of proving it is entitled to damages against Trustee in amount of $852,501.83 due to Red Rock's breach of the McCormack subcontract.**

**(a).  Suffolk may "backcharge" Red Rock for the reasonable costs it incurred to complete and repair Red Rock's work under the McCormack subcontract.**

Trustee maintains that Article 8.6.2 of the McCormack subcontract did not permit Suffolk to both terminate the McCormack subcontract upon Red Rock's breach and then backcharge Red Rock for the costs Suffolk incurred to complete Red Rock's work on the subcontract.  I disagree.

Article 8.6.2 of the McCormack subcontract states, in pertinent part:

> **8.6.2** If the Subcontractor at any time defaults in any of its obligations under this Subcontract ... the Contractor may, after twenty-four (24) hours' written notice to the subcontractor ... and without prejudice to any other remedy it may have (i) provide any such labor and materials and deduct the cost thereof from any money due or thereafter becoming due to the Subcontractor, or (ii) terminate the employment of the Subcontractor and enter upon the Project and take possession of all materials and equipment whatsoever thereon, including, without limitation, all materials stored on or off site, and employ any other person or persons to finish the Work and provide materials therefore.  If the Contractor undertakes to correct such deficiencies provided in (i) of this Paragraph or to terminate the Subcontract as provided in (ii) of this Paragraph, the Subcontractor shall not be entitled to receive any further payments under this

Subcontract until all work at the Project is completed.

In the event the Contractor undertakes to correct the
Subcontractor's deficiencies pursuant to (i) above and
not terminate this Subcontract, appropriate Change
Order(s), under Paragraph 8.13, shall be issued,
deducting from the payment then or thereafter due (a) all
of the Contractor's direct and indirect costs of correcting
such deficiencies or completing the Work and (b) the
costs or other damages to the Contractor of any delay
made necessary by the Subcontractor's default, neglect,
failure or termination; whereupon the Subcontract Sum
shall be appropriately reduced by any of the above costs.
If the cost of such remedial action shall exceed the
unpaid balance of the Subcontract Sum, the
Subcontractor shall promptly pay such difference to the
Contractor.  If the cost of completing the Work of this
subcontract exceeds the unpaid balance of the
Subcontract Sum, the Subcontractor shall promptly pay
such difference to the Contractor.

Joint Exhibit J-44 at p. SCCIM 0001225.

Trustee, relying on the second paragraph of Article 8.6.2, argues that

Suffolk may not backcharge Red Rock for the costs Suffolk incurred in

completing the McCormack subcontract because Suffolk chose to terminate Red

Rock's employment pursuant to option (ii) quoted above.  Trustee maintains that

the "without prejudice to any other remedy" language found in the first paragraph

of Article 8.6.2 means that Suffolk could choose any one of three remedies — the

remedy outlined in option (i), the termination remedy outlined in option (ii), or the common law remedy, but no more than any one of them.

Suffolk, on the other hand, relies on the "may" and "without prejudice to any other remedy" language found in the first paragraph of Article 8.6.2, as well as Massachusetts law on election of remedies in the breach of contract context. Suffolk argues that the remedies in (i) and (ii) of Article 8.6.2. are not exclusive and posits that Article 8.6.2 does not prohibit it from electing one of the remedies outlined in (i) or (ii), as quoted above, and also taking advantage of common law breach of contract remedies. In other words, Suffolk contends that it had the right to terminate Red Rock under option (ii), while retaining its common law right to recover damages for the cost of retaining substitute subcontractors to complete Red Rock's work. I agree with Suffolk's suggested approach.

The terms "may" and "without prejudice to any other remedy" are inclusive or permissive terms, not exclusive. Massachusetts courts have analyzed similar contractual language and have determined that the use of the term "may" means that the stated remedy is not exclusive. The First Circuit Court of Appeals has instructed:

> In using the clause 'the contractor may ...' before the
> specification of two remedies, ... Article XV [of the
> parties' contract] sets forth elective rights of the general

> contractor in case of breach by the subcontractor.  Under
> Massachusetts law, if a contract does not specify that the
> remedies identified are exclusive, or that they abrogate
> the common law remedies available, the common law
> remedies still apply.

United States Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 49 (1st Cir. 2002);

see also Holyoke Water Power Co. v. Whiting Co., 177 N.E. 568, 574 (Mass.

1931); Finkelstein v. Sneierson, 173 N.E. 703, 704 (Mass. 1930).

Trustee urges me to narrowly interpret United States Steel.  He argues

that, although the contractual remedies do not exclude the possibility of electing a

common law remedy, a contractual remedy becomes exclusive if elected.  This

interpretation, however, ignores and does not give effect to the phrase "without

prejudice to any other remedy it may have" which immediately precedes the

options listed under (i) and (ii) in Article 8.6.2.  As noted, Trustee's suggested

interpretation requires that I ignore this phrase and hold that a party, by exercising

one of the remedies enumerated in (i) or (ii), does in fact prejudice its right to elect

some other remedy it may have.  This interpretation runs counter to the First

Circuit Court of Appeals' admonition that "[u]nder Massachusetts law, if a

contract does not specify that the remedies identified are exclusive, or that they

abrogate the common law remedies available, the common law remedies still

apply."  United States Steel, 315 F.3d at 49.  The McCormack subcontract did not

-57-

specify that the remedies identified were exclusive or that they abrogated the common law remedies available to the non-breaching party upon the other parties' breach.  So, the common law remedies continued to apply and could be exercised by Suffolk after it terminated the subcontract due to Red Rock's breach.

In Global Software, Inc. v. DTS Software Brasil LTDA, No. Civ. A. 00-10033-GAO, 2002 WL 73819, at *1-4 (D. Mass. Jan. 15, 2002), the court was faced with a situation in which the contract specified the remedies available in the event one party terminated the contract.  The court ruled that the non-breaching party who elected to terminate the contract could nonetheless terminate the contract as outlined in the contract and could still recover damages based on common law breach of contract remedies.  The court stated,

> DTS argues that because the contract expressly provides for termination as a remedy for breach . . . , termination is the exclusive remedy.  However, under Massachusetts law, expressly stated remedies are not automatically exclusive.  Instead, a court must examine the entire agreement to determine whether the parties intended for the remedy given under the contract to be exclusive.

Global Software, 2002 WL 73819, at *2 (footnote and citations  omitted).

In the Commonwealth of Massachusetts, "[t]he fundamental principle upon which the rule of damages is based is compensation. . . .  Compensation is

the value of the performance of the contract, that is, what the plaintiff would have
made had the contract been performed. . . . The plaintiff is entitled to be made
whole and no more." <u>Louise Caroline Nursing Home, Inc. v. Dix Constr. Corp</u>,
285 N.E.2d 904, 907 (Mass. 1972) quoting <u>Ficara v. Belleau</u>, 117 N.E. 2d 287,
289 (Mass. 1954) (internal citation omitted). In other words, "a plaintiff in an
action for breach of contract is entitled to damages in an amount sufficient to put
him in as good as, but not better than, the financial position he would have been in
had there been no breach." <u>Normandin v. Eastland Partners, Inc.</u>, 862 N.E.2d
402,416 (Mass. App. Ct. 2007).

The common law damages to be awarded in a breach of construction
contract case in which a subcontractor "fails to complete the construction job in
the manner described in the contract is the reasonable cost of completion and
repair of the [subcontractor's] defective work." <u>Towner v. Bennington Constr.
Co.</u>, No. 0033B, 2005 WL 3105653, at *11 (Mass. App. Ct. Oct. 12, 2005),
quoting <u>Louise Caroline Nursing Home</u>, 285 N.E.2d 907-08. Stated another way,
Massachusetts courts hold: "The measure of the plaintiffs' damages (at least in the
absence of other elements of damage, as, for example, for delay in construction, . .
.), can be only the reasonable cost of completing the contract and repairing the
defendant's defective performance less such part of the contract price as has not

been paid." Louise Caroline Nursing Home, 285 N.E.2d at 907-08, quoting

DiMare v. Capaldi, 147 N.E.2d 517, 521 (Mass. 1957).

I agree with Suffolk that Trustee's interpretation of the McCormack

subcontract belies both common sense and the parties' intent. Trustee's position is

that Suffolk, by terminating the McCormack subcontract under Article 8.6.2(ii)

due to Red Rock's breach, is limited in its damage recovery to entering the project,

taking possession of all materials and equipment, and employing other

subcontractors to complete and repair Red Rock's work at Suffolk's expense.

According to Trustee, Suffolk may terminate the subcontract after Red Rock's

breach and may incur the expense of hiring other subcontractors to complete Red

Rock's work; but Suffolk may not recover from Red Rock the cost to complete

and repair Red Rock's work, even if these costs exceed the unpaid balance of the

subcontract price. Such an interpretation belies "'[t]he fundamental principle

upon which the rule of damages is based . . . . Compensation is the value of the

performance of the contract, that is, what the plaintiff would have made had the

contract been performed. The plaintiff is entitled to be made whole and no

more.'" Louise Caroline Nursing Home, 285 N.E.2d at 907 (internal quotation

omitted).

Neither is Trustee's interpretation consistent with the intent of the

parties. Both the Notice of Default and the Notice of Termination issued by

Suffolk to Red Rock under the McCormack subcontract stated that Suffolk would

be terminating the subcontract and would be providing labor, material, and

equipment to complete Red Rock's work at Red Rock's expense, referencing both

Article 8.6.2(i) and (ii). Joint Exhibits J-49 and J-50.[33] Jason Goldberg, the

President of Red Rock at the relevant period of time, responded to the default

notice by sending a letter to Suffolk. In his letter, Mr. Goldberg disputed

Suffolk's contention that Red Rock was in default under the McCormack

subcontract, but did not take issue with Suffolk's position that it could both

terminate the McCormack subcontract and complete Red Rock's work at Red

Rock's expense. Joint Exhibit J-51. Mr. Goldberg would have voiced concern

about the backcharge had he truly believed it was not permitted under the terms of

the parties' subcontract. For all of these reasons, I find that Suffolk may

---

[33] The Notice of Default and the Notice of Termination refer to both Article 8.6.2(i) and
(ii). This is not problematic because the use of the word "may" in the subcontract when
describing the remedies available upon breach signifies that the remedies are not exclusive.
United States Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 49 (1st Cir. 2002); see also
Holyoke Water Power Co. v. Whiting Co., 177 N.E. 568, 574 (Mass. 1931); Finkelstein v.
Sneierson, 173 N.E. 703, 704 (Mass. 1930). In addition, Suffolk's ability to backcharge Red
Rock for the cost of retaining substitute subcontractors to complete and repair Red Rock's work
after Red Rock's default, to the extent these costs exceed the unpaid balance of the subcontract
price, comports with common sense, the intent of the parties, and the fundamental principle of
contract damages that the nonbreaching party to a contract is entitled to the value of the contract
to be made whole.

"backcharge" Red Rock for the reasonable costs Suffolk incurred to complete and

repair Red Rock's work under the McCormack subcontract after Suffolk declared

Red Rock in default and terminated the subcontract. Suffolk may recover these

costs minus the unpaid balance of the subcontract price. <u>Louise Caroline Nursing</u>

<u>Home</u>, 285 N.E.2d at 907.

### (b). The starting point for determining Suffolk's damages is the subcontract price, not Suffolk's schedule of values for demolition or the amount Suffolk was paid for demolition by GSA.

Trustee argues that Suffolk's damages should be determined by

subtracting the reasonable costs to complete and repair Red Rock's work, plus the

amount Suffolk paid to Red Rock under the McCormack subcontract, either from

Suffolk's schedule of values for demolition (which Trustee alleges was

$5,042,479), or from the amount Suffolk was paid for demolition, after change

orders, by the owner of the McCormack project. Trustee alleges that latter amount

was at least $6,000,000. Trustee's Oral Argument Submission No. II, attached to

this Memorandum Opinion as Addendum III, at 2. Trustee cites no authority for

this novel approach.[34]

---

[34] Trustee maintains that I must then add to that amount the value of scrap revenue still owed to Red Rock and additional GSA change orders for demolition work. Trustee's Oral Argument Submission No. II, attached to this Memorandum Opinion as Addendum III, at 2.

Suffolk disagrees and maintains, with citation to Massachusetts case law,[35] that the starting point should be the McCormack subcontract price ($3,905,000). I should then subtract from that figure, Suffolk continues, the sum of the reasonable costs to complete and repair Red Rock's work plus the amount Suffolk paid to Red Rock. Suffolk agrees that I must then add to that amount the value of scrap revenue still owed to Red Rock and improper backcharges. Suffolk's Oral Argument Submission No. II, attached to this Memorandum Opinion as Addendum IV, at 1-2.

I find and conclude that Suffolk's approach best comports with Massachusetts law on computation of breach of contract damages. The non-breaching party is entitled to the "value of the performance of the contract, that is, what [it] would have made had the contract been performed." Louise Caroline Nursing Home, 285 N.E.2d at 907. Using either of Trustee's suggested starting points, (Suffolk's schedule of values for demolition or the amount Suffolk was paid by GSA for demolition), would provide Suffolk neither with the value of the performance of the McCormack subcontract nor with what it would have made had the McCormack subcontract been properly performed by Red Rock. The only way to achieve this goal and insure that Suffolk receives the benefit of its bargain

---

[35] Louise Caroline Nursing Home, 285 N.E.2d at 907-08.

-63-

is to use the McCormack subcontract price as the starting point, as Suffolk

suggests.

### (c).  Reasonable costs to complete and repair Red Rock's work on McCormack project.

Both Trustee and Suffolk agree that if I determine that Red

Rock breached the McCormack subcontract and that the McCormack subcontract

permits Suffolk to backcharge Red Rock for the costs to complete and repair Red

Rock's work, Suffolk's damages are limited by "the reasonable cost of completing

the contract and repairing [Red Rock's] defective performance."  Louise Caroline

Nursing Home, 285 N.E.2d at 907-08.  I agree with Trustee that many of the

charges imposed by Suffolk for completing and repairing Red Rock's work are not

reasonable.  Also, some of the charges are not properly chargeable to Red Rock.

To the extent that Suffolk's attempted charges are either unreasonable or not

chargeable to Red Rock, they may not be used to determine Suffolk's damages.

### (i).  Deductive change orders.

I begin by analyzing the second set of charts utilized by Suffolk and

Trustee during the May 9, 2012 oral argument, which are attached to this

Memorandum Opinion as Addendum III, referred to as Trustee's Oral Argument

Submission No. II, and Addendum IV, referred to as Suffolk's Oral Argument

Submission No. II. As I previously explained, the starting point for this analysis is

the original McCormack subcontract price, which was $3,905,000. From this

figure, I subtract deductive Change Order Nos. 1 - 9, 14, 15, 19 and 20 (which

total $145,803.00), all of which I find are reasonable and were proven by

Suffolk.[14] I will not subtract Change Order Nos. 13, 18 and 21 because the

documents attached to these change orders show, and Suffolk concedes, that they

represent costs incurred to repair damage caused by Liberty Construction

("Liberty"), a Suffolk affiliate hired by Suffolk to complete Red Rock's work on

the McCormack project. See Defendant's Exhibit 1, McCormack RR Cos.[15]

Change Orders 13, 18 and 21 therefore cannot be charged to Red Rock.

After subtracting deductive Change Order Nos. 1 - 9, 14, 15, 19 and

20 from the original McCormack subcontract price, I arrive at $3,759,197, which

represents the adjusted McCormack subcontract price.  ($3,905,000 [original

McCormack subcontract price] - $145,803 [Deductive Change Orders No. 1-9, 14,

15, 19 and 20] = $3,759,197 [adjusted McCormack subcontract price]). For some

reason, however, Suffolk arrived at an adjusted McCormack subcontract price of

---

[14] Trustee concedes that Change Order No. 1, in the amount of $120,000, must be deducted from the original McCormack subcontract price. This Change Order represents the amount that Suffolk was forced to pay for Red Rock to obtain a performance bond.

[15] Change Orders No. 10 - 12, 16 and 17 were not deductive change orders. They were change orders that resulted in an increase in the subcontract price.

$3,775,078, using the same figures outlined in Suffolk's Oral Argument

Submission No. II and taking deductions only for Change Order Nos. 1 - 9, 14, 15,

19 and 20.  For reasons unbeknownst to me and not disclosed in the record or in

any of its submissions,  Suffolk deducted $129,992 rather than $145,803 from the

original McCormack subcontract price.  Because Suffolk is more intimately

familiar with the various figures in this litigation, and because its suggested

adjusted subcontract price ($3,775,078) is more detrimental to it than the

$3,759,179 figure I calculated, I will use $3,775,078 as the adjusted McCormack

subcontract price.

### (ii).  Items the parties agree must be deducted from the adjusted subcontract price.

Trustee concedes that $2,756,834.27 must be deducted from the

$3,775,078 adjusted subcontract price, as follows:  (1) $1,103,454, which the

parties agree Suffolk paid to Red Rock on the McCormack subcontract; (2)

$130,000, which the parties agree Suffolk paid to United Energy for making

payments that Red Rock owed to United Energy; (3) $80,342.66, which the parties

agree Suffolk paid to Red Rock's vendors; (4) $167,013.64, which the parties

agree Suffolk paid to Red Rock's workforce on the McCormack project; (5)

$922,731.97, which the parties agree is the amount Suffolk paid on behalf of Red

Rock for delinquent union benefits; (6) $217,980, which is the amount the parties agree Suffolk paid to Boston Chimney to complete part of Red Rock's work on the McCormack project; and (7) $135,312, which the parties agree Suffolk paid to Envirotest Laboratory, Inc., to complete and repair Red Rock's work on the McCormack project. Subtracting $2,756,834.27 from the adjusted subcontract price of $3,775,078 results in a net adjusted subcontract price of $1,018,243.73. ($3,775,078 - $2,756,834.27) = $1,018,243.73.

### (iii). Cost to complete and repair Red Rock's work - work performed by Liberty and NASDI.

Suffolk is seeking credit against the net adjusted subcontract price ($1,018,243.73) in the total amount of $4,714,717.68, which represents the amount Suffolk claims to have paid to Liberty and NASDI to complete the scope of Red Rock's demolition work on the McCormack project. Trustee, while acknowledging that Suffolk is entitled to a credit for the reasonable cost to complete Red Rock's work, balks at this request, claiming that Liberty's invoices were grossly inflated, unreasonable, and excessive. Trustee also argued, among other things, that Suffolk's demand included work that was not within the scope of Red Rock's demolition work and therefore not chargeable to Red Rock.

After Suffolk terminated Red Rock on the McCormack project on

-67-

April 11, 2007, Suffolk engaged several subcontractors to complete and repair Red

Rock's scope of work.  Red Rock first hired Liberty, an affiliated company, to

complete and repair Red Rock's demolition work on a time and material basis.

Before being retained to complete and repair Red Rock's demolition work, Liberty

had already been working on the McCormack project performing housekeeping,

clean-up, and salvage and protection work. Liberty had no experience in

demolition work.  Suffolk abrogated any semblance of attempting to oversee and

control Liberty's work and expenses on the McCormack project by failing to

provide Liberty with a budget, a schedule, or adequate supervision and

management.  Suffolk seeks a credit of  $3,414,717.68, which represents the

amount Suffolk claims it paid to Liberty to perform Red Rock's demolition work

on the McCormack project.  Suffolk's Proposed Findings of Fact at 68; N.T. May

10, 2011 at 106:20-24.

In October 2007, Suffolk hired NASDI to complete and repair Red

Rock's demolition work on the McCormack project.  NASDI, unlike Liberty, is an

experienced demolition subcontractor.  Suffolk agreed to pay NASDI the fixed fee

of $1,300,000.00 for its work.  Suffolk also seeks a credit against Trustee for this

amount.

My attempt to determine, based on the record before me, the exact

-68-

amount that Suffolk paid to Liberty to perform Red Rock's demolition work on the

McCormack project is practically impossible. As Trustee's cross examination

established during the trial, the Liberty invoices included numerous charges for

work that was unquestionably non-demolition, such as charges for truck drivers,

fuel, vacuums, glass cleaner, furniture polish, feather dusters, rags and paper

towels. The backup documentation for these invoices showed, through a more or

less random search, that a substantial portion of the work being performed by

Liberty, and charged to Red Rock, involved housekeeping services, such as

cleaning and restocking bathrooms, vacuuming offices, sweeping, trash pick up,

snow removal and replacing ceiling tiles in Suffolk's office, and protection and

salvage work. This is the type of work that Liberty was retained by Suffolk to

perform on the McCormack project before Red Rock was terminated.

In addition, Trustee established that several of the Liberty invoices

Suffolk is attempting to charge to Red Rock  predate Red Rock's termination from

the McCormack project. See, e.g., Defendant's Exhibit 2, Invoices 07-02901-

0001, 07-02901-00002, 07-02901-00003, 07-02901-00004, 07-02901-00005, 07-

02901-00006 and 07-02901-00007. Trustee also established that discrepancies

existed between the backup documentation and amounts claimed by Suffolk for

work performed by Liberty and charged to Red Rock.

-69-

To add to the difficulty, Liberty had no demolition experience. Liberty's inexperience and production of a great number of invoices that are suspect because they either lack proper documentation, pre-date Red Rock's termination, or improperly seek to charge Red Rock with the cost of non-demolition work, convinces me to agree with Trustee and his expert that Liberty's charges for demolition work are excessive and unreasonable. Liberty performed demolition work at the McCormack project from mid-April of 2007 through October of 2007. Based on Suffolk's requisitions to GSA, Liberty advanced the demolition work from 44.02% complete to 67.78% complete. Trustee's expert opined that Liberty's cost to complete was $138,923 for 23% of the demolition scope. N.T. May 17, 2011, filed on June 2, 2011 (docket no. 186), at 60:10 - 61:7. This was more than double Red Rock's cost to complete and more than NASDI's cost to complete, which was $48,834 for 32% of the demolition scope. Id. at 57:20 - 59:4. Trustee's expert opined that had NASDI, an experienced demolition subcontractor, been brought in immediately after Red Rock was terminated, it would have cost $2,234,375 to complete and repair Red Rock's work on the McCormack project. Id. at 59:16 - 60:8; Addendum III, Trustee's Oral Argument Submission No. II, at 2.

For this reason, Trustee, acknowledging that Suffolk is entitled to a

credit for the cost to complete and repair Red Rock's demolition work, suggests

that I utilize his expert's extrapolation of NASDI's cost to complete Red Rock's

work as the amount to credit Trustee for the costs of both Liberty and NASDI to

complete and repair Red Rock's scope of work on the McCormack project.  I

agree with the analysis proffered by Trustee and his expert and I will credit

Suffolk with  $2,234,375 as the reasonable amount needed to complete and repair

Red Rock's demolition work on the McCormack project.  This amount

($2,234,375) must therefore be deducted from the net adjusted subcontract price

($1,018,243.73) to determine Suffolk's damages.  This calculation reveals Suffolk

suffered damages in the amount of $1,216,131.27 as a result of Red Rock's breach

of the McCormack subcontract.  ($1,018,243.73 - $2,234,375 = ($1,216,131.27)).

### (iv).  Scrap revenue due to Red Rock.

Both Trustee and Suffolk agree that Trustee is entitled to a credit for

the scrap under the McCormack subcontract.  Before it was terminated, Red Rock

was entitled to all of the scrap at the McCormack project.  After Red Rock was

terminated, however, Suffolk received all of the funds from the scrap recovered.[16]

The parties disagree, however, on the amount that should be credited.  Trustee

---

[16]Had Red Rock not been terminated, it would have received all of the value of the scrap
at the McCormack project. N.T. April 14, 2011 trial, at 44:3-6.

seeks a credit in the amount of $428,871.51 for the scrap, while Suffolk argues

that Trustee is only entitled to a scrap credit of $233,629.44.

Both Trustee and Suffolk agree that Suffolk recovered at least

$281,629.44 in scrap after Red Rock was terminated.  N.T. April 14, 2011 trial, at

45:22 - 47:16; Trustee's Exhibit P-179.  This scrap is reflected in Trustee's

Exhibit P-179.  In addition, Suffolk had an agreement with NASDI under which

they would split the scrap recovered by NASDI on the McCormack project.

NASDI recovered approximately $115,445.21 of scrap, but Suffolk retained all

but $48,000 of NASDI's scrap recovery.  Suffolk maintains that the $115,445.21

in scrap was included in the $281,629.44 figure; Trustee maintains that it was not.

Trustee also maintains that after January 2008, Suffolk recovered an additional

$31,796.86 in scrap.  Id. at 47:20 - 58:21.  Suffolk, on the other hand, maintains

that this scrap was also included in the $281,629.44 figure.

Suffolk's position is that it received a total of $281,629.44 in scrap

after Red Rock was terminated, and that from this amount it paid NASDI $48,000.

Suffolk therefore posits that Trustee is entitled to a credit in the amount of

$233,629.44 for scrap. ($281,629.44 - $48,000 = $233,629.44).

Trustee maintains that Suffolk received a total of $428,871.51 in

scrap after Red Rock was terminated and that he should be credited with this entire

amount, including the $48,000 Suffolk paid to NASDI.  In other words, Trustee

posits that Suffolk first received $281,629.44 in scrap.  Trustee also argues that the

$115,445.21 and $31,796.86 that Suffolk received for scrap was in addition to the

$281,629.44 figure noted above.  Adding all of these amounts together results in

the $428,871.51 figure that Trustee seeks as a credit for scrap.  ($281,629.44 +

$115,445.21 + $31,796.86 = $428,871.51).

Based on the record before me, I find that Trustee failed to establish

that the additional scrap for which he seeks a credit was not included in the

$281,629.44 figure depicted in Trustee's Exhibit P-179.  Trustee relied on

Trustee's Exhibit P-167 to attempt to show that the $115,445.21 in scrap was not

included in the $281,629.44 figure.  Trustee's Exhibit P-179 itemizes the scrap by

date in dollar amounts.[17]  Trustee's Exhibit P-167, which itemizes the scrap by

date shipped, does not contain a dollar amount for each date scrap was shipped.

Instead, it appears to depict the scrap by measurement.  This makes it impossible

for me to accurately compare and analyze these two Exhibits to determine whether

the scrap reflected in Trustee's Exhibit P-167 is included in the $282,629.44 figure

---

[17] Although Trustee's Exhibit P-179 itemizes the scrap by date, it does not indicate
whether the dates listed are the date the scrap was recovered, the date the scrap was sold, the date
the scrap was shipped, or some other date.  Instead, it itemizes the scrap by "item date" and by
"Pa date," adding to the confusion.

in Trustee's Exhibit P-179. As a result, I find that Trustee failed to meet his burden of proving that Red Rock was entitled to an additional credit of $115,445.21 for scrap.

A similar problem exists with the additional $31,796.86 Trustee seeks to have credited. Trustee relied upon Trustee's Exhibit P-135 to attempt to show that this scrap was not included in the $281,629.44 figure in Trustee's Exhibit P-179. Again, Trustee's Exhibit P-179 describes the scrap in dollar amounts by date, while Trustee's Exhibit P-135 depicts the scrap in volume tonnage and confirmed tonnage by date shipped, which makes it impossible to accurately compare and analyze these two Exhibits to determine whether the scrap reflected in Trustee's Exhibit P-135 is included in Trustee's Exhibit P-179. I therefore find that Trustee failed to establish that he is entitled to an additional credit of $31,796.86 for scrap.

Having found that Trustee is entitled to a credit in the amount of $233,629.44 for scrap, this amount must be subtracted from Suffolk's damages ($1,216,131.27) to arrive at a net damage award in favor of Suffolk and against Trustee in the amount of $982,501.83. ($1,216,131.27 - $233,629.44 = $982,501.83).

### (v).   Amounts owed to Red Rock for change orders submitted by Suffolk and approved by GSA for extra demolition work.

Trustee argues that he is also entitled to a credit for several change orders submitted by Suffolk and approved by GSA for demolition work performed in addition to the demolition work required under the McCormack subcontract. I agree in part with Trustee's position.

The record reflects that Red Rock performed additional demolition work that was not required by the McCormack subcontract. This additional demolition work is itemized in Change Order PS-04, Change Order PS-06, and Change Order PS-09. Trustee established at trial that Suffolk was paid by GSA for the work described in these Change Orders but that Suffolk failed to pay Red Rock for all of the work. Specifically, Red Rock was not paid the following amounts on each of the Change Orders: (1) Change Order PS-04 - $26,563 remains unpaid, (2) Change Order PS-06 - $38,652 remains unpaid; and (3) Change Order PS-09 - $65,085 remains unpaid. These unpaid amounts total $130,300. See N.T. April 14, 2011 trial at 61:15 - 75:18. I find, based on the record before me, that Trustee, standing in the shoes of Red Rock, is entitled to a credit of $130,300 based on these Change Orders.

Trustee next requests a credit for demolition work performed by Liberty that was not within the scope of the original McCormack subcontract. I find Trustee's request without merit.

Liberty performed demolition work outside the scope of the original

McCormack subcontract, as evidenced by Change Order PC-14. This Change

Order requests additional payment of $45,227 for demolition work performed by

Liberty. N.T. April 14, 2011 trial at 82:28 - 85:20. Trustee acknowledges that

Red Rock did not perform this work, yet he nonetheless seeks payment for it on

the theory that Red Rock would have performed the extra work and would have

been entitled to payment had it not been terminated. Having previously found that

Red Rock breached the McCormack subcontract and that Suffolk's termination of

Red Rock was justified, see p. 52-53, supra, I see no merit to Trustee's argument.

Trustee is therefore entitled to a credit in the amount of $130,300 for

work performed by Red Rock outside the scope of the original McCormack

subcontract (but within the scope of certain change orders) for which Red Rock

was not compensated. Suffolk was paid for this work by GSA and this amount

must be subtracted from Suffolk's damages ($982,501.83) to arrive at a net

damage award in favor of Suffolk and against Trustee in the amount of

$852,501.83. ($982,501.83 - $130,300 = $852,201.83).

## (4). Setoff under Bankruptcy Code – 11 U.S.C. §553(a).

Suffolk maintains that it is entitled to offset the $852,501.83 awarded

to it under the McCormack subcontract against the $1,156,909.46 awarded to

Trustee under the Silo Point subcontract.[18]

      "The right of setoff (also called 'offset') allows entities that owe each

other money to apply their mutual debts against each other, thereby avoiding 'the

absurdity of making A pay B when B owes A.'" Citizens Bank of Maryland v.

Strumpf, 516 U.S. 16, 18 (1995) quoting Studley v. Boylston Nat. Bank, 229 U.S.

523, 528 (1913).  The Bankruptcy Code preserves the common law right to setoff

amounts due from the debtor against amounts owed to the debtor. 11 U.S.C.

---

[18] Suffolk takes the alternative position that the doctrine of recoupment, as opposed to setoff, applies to this case, so that, were I to find setoff inapplicable here, Suffolk would nonetheless prevail based on a recoupment theory.
    The doctrine of recoupment generally involves claims arising out of the same transaction, while setoff involves claims arising out of different transactions. Louisiana Indus. Coatings, Inc. v. Boh Bros. Constr. Co. (In re Louisiana Indus. Coatings, Inc.), 53 B.R. 464, 469 n. 4 (E.D. La. 1985). "In bankruptcy, the recoupment doctrine has been applied primarily where the creditor's claim against the debtor and the debtor's claim against the creditor arise out of the same contract." Lee v. Schweiker, 739 F.2d 870, 875 (3d Cir. 1984). "The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable." Lee, 739 F.2d at 875.
    Suffolk cites Louisiana Indus. Coatings, 53 B.R. at 469-70, to support its argument that because the Silo Point and McCormack subcontracts each permit the parties to offset debts due under one subcontract against debts owing under the other, the subcontracts should be treated as one transaction for recoupment/setoff purposes.  Although the Louisiana Indus. Coatings court did adopt this reasoning, it appears to be a minority approach.  Because I find that Suffolk is entitled to offset the debt it owes Trustee under the Silo Point subcontract against the debt Red Rock (and therefore the Trustee) owes Suffolk under the McCormack subcontract, I need not rule on Suffolk's alternative recoupment theory.

§553(a).[19]

To assert a right of setoff under section 553(a) successfully, the

asserting party must show: (1) A pre-petition debt exists from the creditor to the

debtor; (2) the creditor holds a pre-petition claim against the debtor;  and (3) the

debt and the claim are mutual obligations.  Folger Adam Security, Inc. v.

Dematteis/MacGregor, JV, 209 F.3d. 252, 262-63 (3d Cir. 2000).

Although I will not permit a setoff if the result would be inequitable,

illegal, or violate public policy, "setoffs under section 553 'are generally favored, .

. . [although] not automatically permitted.'"  Szymanski v. Wachovia Bank (In re

Szymanski), 413 B.R. 232, 242 (Bankr. E.D. Pa. 2009) quoting Melamed v. Lake

County Nat. Bank, 727 F.2d 1399, 1404 (6th Cir. 1984).

> Recognizing a strong federal policy towards allowing
> setoff, the Second Circuit is reluctant to disturb this
> policy unless compelling circumstances require it.  A
> decision disallowing a setoff must not be made
> cavalierly. . . .  Likewise, other courts have recognized
> that there is practically a presumption in favor of
> allowing setoff. . . .
> The burden is on the party moving to deny setoff to
> prove that setoff should be denied.

---

[19] As I stated earlier, to the extent state law governs any dispute that arises under the
McCormack contract, Massachusetts law governs the dispute. Massachusetts law permits setoff.
Comm'r of Ins. v. Munich Am. Reinsurance Co., 706 N.E.2d 694, 695-97 (Mass. 1999); Mass.
Motor Vehicle Reinsurance Facility v. Comm'r of Ins., 400 N.E.2d 221, 227-28 (Mass. 1980).

Szymanski v. Wachovia Bank (In re Szymanski), 413 B.R. 232, 242 (Bankr. E.D.

Pa. 2009) quoting S.E.C. v. Elliott, 953 F.2d 1560, 1572 (11th Cir. 1992)(citations

omitted), rev'd in part on other grounds, 998 F.2d 922 (11th Cir. 1993).

### (a). The debts in issue must both arise pre-petition.

The term "debt" is defined under the Bankruptcy Code  as a "liability

on a claim."  11 U.S.C. §101(12).  The Bankruptcy Code defines "claim" as a

"right to payment, whether or not such right is reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,

equitable, secured or unsecured; . . ."  11 U.S.C.  §101(5)(A).  A debt arises for

setoff purposes, therefore, "when all transactions necessary for liability occur,

regardless of whether the claim was contingent, unliquidated, or unmatured when

the petition was filed." Agric. Stabilization and Conservation Serv. v. Gerth, 991

F.2d 1428, 1433 (8th Cir. 1993) citing Braniff Airways, Inc. v. Exxon Co., USA,

814 F.2d 1030, 1036 (5th Cir. 1987).

### (i).  The debt owed by Suffolk to Trustee on the Silo Point project is a pre-petition debt.

Trustee argues that the "pay if paid" provision found in the

parties' Silo Point subcontract[20] renders the debt owed to Red Rock by Suffolk on

the Silo Point subcontract a post-petition debt.  I disagree.

As I stated above, a debt is considered pre-petition "when all things

necessary for liability occur, regardless of whether the claim was contingent,

unliquidated, or unmatured when the petition was filed." Gerth, 991 F.2d at 1433.

"[D]ependency on a postpetition event does not prevent a debt from arising

prepetition." Id.  Here, Red Rock's work on the Silo Point subcontract was

completed pre-petition and Red Rock submitted the change orders to Suffolk pre-

petition.  All things necessary for Suffolk's liability to Red Rock on the Silo Point

project to arise, therefore, occurred pre-petition. The fact that Suffolk might argue

that its obligation to pay Red Rock had not matured or was contingent on it

receiving payment from Silo Point does not render the debt post-petition for setoff

purposes. Id.; Braniff, 814 F.2d at 1036.

### (ii).  The debt owed by Red Rock to Suffolk on the McCormack project is a pre-petition debt.

Trustee does not take issue with the characterization of the debt owed

---

[20] Article 4 of the parties' Silo Point subcontract states that Suffolk shall pay Red Rock within ten days of its receipt of funds from Silo Point provided Red Rock's rate of progress and general performance are satisfactory. The parties' refer to this provision as the "pay if paid" provision.

by Red Rock to Suffolk on the McCormack project as a pre-petition debt. I

therefore see no need for me to engage in a detailed analysis other then to note that

Suffolk declared Red Rock in default under the McCormack subcontract on April

9, 2007. Suffolk then terminated the McCormack subcontract on April 11, 2007.

Both of these events occurred pre-petition rendering the debt owed by Red Rock

to Suffolk on the McCormack project a pre-petition debt for purposes of setoff.

### (b). The debts in issue are mutual obligations.

Trustee also does not dispute Suffolk's contention that mutuality of

the obligations owed between Suffolk and Red Rock exists. A detailed analysis of

this issue is therefore unnecessary. Suffice to say that "'[t]o be mutual, the debts

must be in the same right and between the same parties, standing in the same

capacity.'" Cohen v. Sav. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman

Asset Mgmt. Corp.), 896 F.2d 54, 59 (3d Cir. 1990) quoting L. King, 4 Collier on

Bankruptcy, ¶553.04[3] at 553-22 (15th Ed. 1979). The term "capacity" in the

setoff context means that each party must owe the other something in his or her

own name, and not as a fiduciary. In re Nuclear Imaging Sys., Inc., 260 B.R. 724,

735 (Bankr. E.D. Pa. 2000). Here, the debts in issue are between the same parties,

Suffolk and Red Rock, standing in the same capacities (they each owe the other a

debt in their own names) and in the same right. "[E]ach party here contracted with

the other, each breached a contractual obligation to the other and owes the other as

a result." Bevill, Bresler, 896 F.2d at 59. The obligations of Suffolk and Red

Rock are therefore mutual for setoff purposes.

### (c). Trustee failed to prove that setoff should be denied on equitable grounds.

Setoff is an equitable remedy, Bevill, Bresler, 896 F.2d at 57, and

may be denied if the party seeking the setoff has committed inequitable, illegal, or

fraudulent acts. Warrington Market, Inc. v. Fleming Cos., Inc., No. Civ. A. 02-

CV-719, 2003 WL 22594348, at *1 (E.D. Pa. Oct. 10, 2003); Szymanski, 413 B.R.

at 243. Setoff may also be denied if its application would violate public policy.

Warrington Market, 2003 WL 22594348, at *1; Szymanski, 413 B.R. at 243. The

party requesting that setoff be denied bears the burden of proof. Szymanski, 413

B.R. at 242; Nuclear Imaging, 260 B.R. at 738; see also Warrington Market, 2003

WL 2259438, at *1.

Trustee attempts to prove that Suffolk acted inequitably by pointing

to instances where he claims that Suffolk demanded that Red Rock perform work

without being paid. Trustee also complains that Suffolk denied Red Rock's

Change Order No. 00003, then pursued Red Rock's differing site condition claim

against Silo Point, reached a settlement with Silo Point, and never shared any of

-82-

the settlement proceeds with Trustee. Trustee also contends that Suffolk acted

inequitably when it hired its affiliate, Liberty, to complete and repair Red Rock's

work on the McCormack subcontract and paid Liberty millions of dollars for

Liberty's allegedly inefficient work. Trustee goes on to accuse Suffolk of forcing

Red Rock into bankruptcy.

Suffolk, on the other hand, points to many instances in which Red

Rock was severely behind schedule on both the Silo Point and McCormack

subcontracts and to the fact that it was forced to advance funds to Red Rock to

enable Red Rock to meet its payroll on the McCormack project. In fact, Red

Rock's workforce refused to work until Suffolk advanced these funds. After Red

Rock bounced checks, Suffolk was forced to issue joint checks to Red Rock's

vendors and subcontractors on the McCormack project. Suffolk advanced funds

to Red Rock's employees, union, subcontractors, vendors, and suppliers on the

Silo Point project as well. Suffolk also refers to defective work performed by Red

Rock and that Red Rock damaged other subcontractors' work on the Silo Point

project. Finally, Suffolk alleges that Red Rock breached both subcontracts by

failing to complete the work.

Overall, the evidence presented during the eight-day trial left me with

the compelling conclusion that, as is often the case, the behavior of both Red Rock

-83-

and Suffolk on each project was less than flawless, that each party contributed to

the problems that occurred on both projects, and that neither party was without

blame for the failure of the deals between them to succeed as planned.

Nonetheless, the evidence before me simply does not establish that Suffolk acted

so badly, given the similarly egregious conduct of Red Rock, to require that its

setoff request be denied. Suffolk's conduct did not rise to the level necessary to

be deemed inequitable, illegal, fraudulent, or in violation of public policy. I

therefore conclude that Trustee failed to meet his burden to establish that Suffolk

should be denied its setoff request based on equitable grounds.

Trustee next argues that Suffolk's setoff request is subject to

equitable subordination. For equitable subordination to apply, however, Trustee

must establish: (1) Suffolk engaged in inequitable conduct; (2) the misconduct

injured other creditors or conferred an unfair advantage on Suffolk; and (3)

subordination is not inconsistent with the provisions of the Bankruptcy Code.

Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.), 554 F.3d 382, 411-

12 (3d Cir. 2009). For the reasons outlined above, I find that Trustee simply has

not proven that Suffolk's conduct was so improper and so inequitable, given the

similarly egregious conduct of Red Rock, to rise to the level necessary for me to

find that Suffolk's setoff claim should be subject to equitable subordination,

especially because the conduct of Red Rock was far from innocent or faultless.

## (5) Suffolk's failure to request relief from automatic stay does not prejudice its right to offset the amount owed to it by Red Rock on the McCormack project against the debt it owes to Trustee on the Silo Point project in this action.[21]

Trustee next argues that even if Suffolk established its entitlement to offset the amount the he owes it against the amount it owes him, Suffolk's setoff request must nonetheless be denied because Suffolk never requested relief from the automatic stay under 11 U.S.C. §362(d)(1). I disagree.

The automatic stay does not apply to proceedings against the debtor that arise in the same bankruptcy court where the debtor's bankruptcy case is

---

[21] Suffolk also argues that relief from the automatic stay was not required because it took the setoff prior to Red Rock's bankruptcy filing. Suffolk, however, neither alleged in its Answer to the Second Amended Complaint, nor introduced evidence at trial to establish that it actually took a setoff prior to the date Red Rock filed its bankruptcy petition.

Likewise, Trustee alleges for the first time, in a ten and a half line paragraph of its 42 page Proposed Conclusions of Law, that Suffolk needed relief from the automatic stay to issue deductive change orders to Red Rock after Red Rock filed its bankruptcy petition. Trustee then went a bit further by alleging, for the first time, in a five and a half line paragraph in its 39 page Proposed Reply Conclusions of Law, that Suffolk violated the automatic stay by issuing deductive change orders after Red Rock filed its bankruptcy petition.

The Second Amended Complaint does not, however, contain a count requesting sanctions or damages for any alleged violation of the automatic stay, and Trustee neither moved at trial to amend his Second Amended Complaint to include such a request for relief nor mentioned that he sought such relief during the trial. I find, therefore, that to the extent that Trustee is seeking a remedy for this alleged violation, no request for such a remedy is properly before me at this time.

pending. Civic Center Square, Inc. v. Ford (In re Roxford Foods, Inc.), 12 F.3d

875, 878 (9th Cir. 1993). Similarly, it has long been the rule that "a non-debtor's

'request for relief in the nature of a set off [sic] in bankruptcy-court litigation is

logically the equivalent of a request for relief from the automatic stay.'" R.C.R.

Servs., Inc. v. Sciortino (In re Sciortino), 114 B.R. 423, 427 (Bankr. E.D. Pa.

1990) quoting In re TM Carlton House Partners, Ltd., 93 B.R. 859, 870 (Bankr.

E.D. Pa. 1988). No separate motion requesting relief from the automatic stay was

therefore necessary for Suffolk to request an offset in this case. Roxford Foods,

12 F.3d at 878; Sciortino, 114 B.R. at 427; TM Carlton House, 93 B.R. at 870.

        In addition, "[c]ourts generally recognize that, by establishing a right

of setoff, the creditor has established a prima facie showing of 'cause' for relief

from the automatic stay under §362(d)(1). . . . Once the creditor establishes its

right of setoff, the burden then shifts to the debtor to rebut the prima facie

showing." Szymanski, 413 B.R. at 243 quoting In re Ealy, 392 B.R. 408, 414

(Bankr. E.D. Ark. 2008). To the extent relief from the stay might be deemed

necessary in this case, I will treat Suffolk's setoff request as the equivalent of a

section 362(d) motion. Sciortino, 114 B.R. at 427. Suffolk established its right to

setoff, and the burden then shifted to Trustee to rebut the prima facie showing of

cause for relief from the stay, which Trustee failed to do in this case. Szymanski,

-86-

413 B.R. at 243. I find therefore that Suffolk's right to request a setoff is not

prejudiced by its failure to file a separate section 362(d) motion.

# VI. ATTORNEYS' FEES

Both the Silo Point subcontract and the McCormack subcontract provide that the prevailing party is entitled to reasonable attorneys' fees, expert consultation fees and costs incurred in the course of a dispute. See Joint Exhibit J-2 at p. 16, ¶8.16; Joint Exhibit J-44 at p. 16, ¶8.16. Both Trustee and Suffolk have sought an award of attorneys' fees and costs against each other pursuant to these provisions of the subcontracts. These requests, however, are not ripe at this time because no pleadings have specified the amount of fees and costs requested and no record has been made regarding the reasonableness of the fees and costs.[22]

I will therefore defer my decision on the requests for attorneys' fees as a component of damages. I will also defer my final order entering judgment on the substantive issues set forth in this Memorandum Opinion, until the issue of attorneys' fees can be addressed and included as part of the damages awarded herein. I will await appropriate pleadings to be filed, apparently by both parties requesting attorneys' fees and costs.

---

[22] In addition, preliminary issues may need to be resolved regarding whether either party qualifies as a prevailing party since I found that Suffolk breached the Silo Point subcontract while Red Rock breached the McCormack subcontract and that the debts must be offset against each other.

# VII. CONCLUSION

Having found: (1) That Trustee is entitled to an award of damages against Suffolk for breach of the Silo Point subcontract in the amount of $1,156,909.46; (2) that Suffolk is entitled to an award of damages against Trustee, standing in the shoes of Red Rock, for breach of the McCormack subcontract in the amount of $852,201.83; and (3) that Suffolk is entitled to offset the $852,201.83 owed to it by Trustee against the $1,156,909.46 it owes to Trustee, I hereby conclude that Suffolk shall pay Trustee $304,707.63. ($1,156,909.46 - $852,201.83 = $304,707.63. If the parties intend to pursue their claims for attorneys' fees against each other, they shall file appropriate pleadings according to the deadlines established in the Order accompanying this Memorandum Opinion.

An appropriate Order follows.

BY THE COURT

Date: August 30, 2012

RICHARD E. FEHLING
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                                                        :

      RED ROCK SERVICES CO., LLC.              :   Case No. 07-21572 REF
                                         :   Chapter 7
                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT H. HOLBER, CHAPTER 7 TRUSTEE:
OF RED ROCK SERVICES CO., LLC,                    :

                                       :   Adv. Proc. No. 09-2112
             Plaintiff,                    :

              v.                                 :

SUFFOLK CONSTRUCTION COMPANY, INC.,  :

             Defendant.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

## TRUSTEE'S SILO POINT DAMAGES CALCULATION

---

HERRICK, FEINSTEIN LLP
David R. King, Esq.
Aviva Wein, Esq.
210 Carnegie Center, Suite 102
Princeton, New Jersey 08540
(609) 452-3800

## ADDENDUM I
### Trustee's Oral Argument
### Submission No. I

I.    **Amount Due to Red Rock on the Silo Point Subcontract**

| Silo Point Subcontract | Trustee's Record Source | Calculation |
|---|---|---|
| | Statement of Uncontested Facts No. 5 | $2,060,000 |
| Change Orders 1-2 | Joint Exhibit J-19 | ($5,517) |
| Change Orders 3-17, 25-31 | Of the 31 deductive change orders, sixteen (16) were dated before Red Rock's bankruptcy filing in September 2007. (D-3). None of the Suffolk change orders to Red Rock have any transmittal information showing that they were transmitted to Red Rock, let alone delivered before Red Rock filed for bankruptcy. (D-3; Dutton, T7. 159:18-23; 164:1 4). Although Suffolk meticulously kept records of the correspondence that it delivered to its subcontractors, (Dutton, T7. 158:23 25), Suffolk presented no documentary evidence at trial demonstrating that the change orders (other than Change Order No. 0001) were ever actually delivered to Red Rock. (Dutton, T7, 159:18 23).

With the exception of Change Order No. 1, none of the change orders contain a Red Rock signature. (D-3; Dutton, T7. 159:6 13). Most of the change orders are not even signed by Suffolk. (Dutton, T7. 159:14 17; D-3). And no evidence was presented at trial demonstrating that Suffolk complained to Red Rock about the fifteen (15) unsigned and outstanding change orders issued before Red Rock's bankruptcy. (Dutton, T7. 164:14 25; 165:3 11). Suffolk's failure to complain about the lack of signed change orders is inconsistent with its normal practice of issuing complaint letters to Red Rock for every perceived violation of the Subcontract terms. (See, e.g., D-120; D-128; D-140; D-148; D-183; D-186; D-191).

At trial Suffolk introduced D-246 and asserted that Red Rock had agreed to charges for work performed by Oncore Construction. Mr. Dutton testified that Red Rock signed off on extra work slips for Oncore Construction. (D-246; Dutton, T7. 150:13 16). However, a review of these documents showed that they did not prove anything because almost all of the documents were only marked "received" and were not signed by Red Rock on the "work authorized line." (D-246; Dutton, T7. 150:18 151:20).

Mr. Dutton similarly testified that Red Rock signed off on all of the work orders in D | $0.00 |

253. (Dutton, T7. 151:21 24). However, a review of these documents demonstrated that these documents were only marked "received" by Red Rock. (D-253; Dutton, T7. 151:25 152:11).

Finally, Change Order Nos. 17 and 31 were issued after Red Rock filed for bankruptcy and were obviously never accepted or countersigned by Red Rock or by the Trustee, and were never even submitted to the Trustee until they were produced in discovery in this case. (D 3).

| | | |
|---|---|---|
| Change Order 18 | At the time Red Rock left the Silo Point Project it had substantially completed its work (at least 95%), and was performing punch list work. (Pierpont, T2. 79:17 80:21; Goldberg, T1. 107;19 25). Suffolk hired Terra Drilling to complete Red Rock's punch list work at a cost of $129,876. (J-57, Part 3, Pierpont, T2. 79:8 16) | ($129,876) |
| Paid to Red Rock | Red Rock was paid $1,481,908 for its work on the Silo Point Subcontract. (J-57, Part 3; J-3; J-4; J-5; J-6; J-11; Pierpont, T2. 79:4 7). | ($1,481,980) |
| Legendary Properties Lawsuit | Suffolk is not entitled to recoupment or setoff based on an outstanding claim asserted against Suffolk by Legendary Properties, because Suffolk has disputed the claim, has obtained summary judgment dismissing the claim, and is currently defending the appeal on the claim. (Statement of Uncontested Facts Nos. 44 and 46). | $0.00 |
| Total Amount Due to Red Rock On Silo Point Subcontract | | $442,627 |

## II.   Amount Due to Red Rock on Change Order No. 3

| | Trustee's Record Summary | Calculation |
|---|---|---|
| Change Order No. 3 | Statement of Uncontested Facts No. 23-25; 34-36 | $2,692,624 |
| Change Orders 19-24 | No dispute. Paid to vendors on behalf of Red Rock | ($1,597,241) |
| Hartford Insurance Payment | P-36; Slosson, T2. 55:18 - 57:6 | $151,584.65 |
| Total Amount Due to Red Rock On Change Order No. 3 | | $1,246,967.60 |

- 2 -

III.    Total Amount Due to Red Rock

| | |
|---|---|
| Total Amount Due to Red Rock On Silo Point Subcontract | $442,627 |
| Total Amount Due to Red Rock On Change Order No. 3 | $1,246,967.60 |
| Total | $1,689,594.60 |

**SUFFOLK CONSTRUCTION COMPANY, INC.**

**SILO POINT ACCOUNTING**

| | | | Record Evidence |
|---|---|---|---|
| Subcontract | $ | 2,060,000.00 | J-2 |

**Paid to Subs, Suppliers, Vendors**

| | | | |
|---|---|---|---|
| CO 19 | $ | (638,000.00) | D-3 (Silo Point RR COs) - Thyssen |
| CO 20 | $ | (200,000.00) | D-3 (Silo Point RR COs) - United Energy |
| CO 21 | $ | (335,864.00) | D-3 (Silo Point RR COs) - Local 16 |
| CO 22 | $ | (185,000.00) | D-3 (Silo Point RR COs) - United Crane |
| CO 23 | $ | (165,000.00) | D-3 (Silo Point RR COs) - Washington Air |
| CO 24 | $ | (73,377.00) | D-3 (Silo Point RR COs) - Volvo/Equiprents |
| Sub-total | $ | (1,597,241.00) | |

**Paid to Complete RR Work**

| | | | |
|---|---|---|---|
| CO 1 | $ | (4,200.00) | D-3 (Silo Point RR COs) |
| CO 10 | $ | (42,832.00) | D-3 (Silo Point RR COs) |
| CO 11 | $ | (1,725.00) | D-3 (Silo Point RR COs) |
| CO 17 | $ | (660.00) | D-3 (Silo Point RR COs) |
| CO 18 | $ | (129,935.00) | D-3 (Silo Point RR COs) |
| CO 26 | $ | (3,387.00) | D-3 (Silo Point RR COs) |
| CO 27 | $ | (4,350.00) | D-3 (Silo Point RR COs) |
| CO 28 | $ | (44,121.00) | D-3 (Silo Point RR COs) |
| CO 29 | $ | (960.00) | D-3 (Silo Point RR COs) |
| CO 30 | $ | (590.00) | D-3 (Silo Point RR COs) |
| Sub-total | $ | (232,760.00) | |

**Paid to Remedy Defective/Delayed Work**

| | | | |
|---|---|---|---|
| CO 2 | $ | (1,317.00) | D-3 (Silo Point RR COs) |
| CO 3 | $ | (1,019.00) | D-3 (Silo Point RR COs) |
| CO 4 | $ | (786.10) | D-3 (Silo Point RR COs) |
| CO 5 | $ | (2,053.00) | D-3 (Silo Point RR COs) |
| CO 6 | $ | (1,129.00) | D-3 (Silo Point RR COs) |
| CO 7 | $ | (878.00) | D-3 (Silo Point RR COs) |
| CO 8 | $ | (14,447.00) | D-3 (Silo Point RR COs) |
| CO 9 | $ | (7,516.00) | D-3 (Silo Point RR COs) |
| CO 12 | $ | (9,682.00) | D-3 (Silo Point RR COs) |
| CO 13 | $ | (16,008.00) | D-3 (Silo Point RR COs) |
| CO 14 | $ | (57,142.00) | D-3 (Silo Point RR COs) |
| CO 15 | $ | (26,186.00) | D-3 (Silo Point RR COs) |
| CO 16 | $ | (2,494.00) | D-3 (Silo Point RR COs) |

<u>**ADDENDUM II**</u>
**Suffolk's Oral Argument**
**Submission No. I**

| | | | |
|---|---|---:|---|
| CO 25 | $ | (16,269.00) | D-3 (Silo Point RR COs) |
| CO 31 | $ | (14,366.00) | D-3 (Silo Point RR COs) |
| **Sub-total** | $ | **(171,292.10)** | |
| | | | |
| **Adj Subcontract** | $ | **58,706.90** | |
| | | | |
| RR Payments | $ | (1,481,980.00) | J-57 (Payments to RR) |
| Legendary Properties Claim | $ | (719,101.66) | Pierpont Testimony |
| Cost Recovered | $ | 1,423,273.10 | Pierpont Tetstimony |
| | | | |
| **Silo Point Damages** | $ | **(719,101.66)** | |

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:     :

       RED ROCK SERVICES CO., LLC.     :    Case No. 07-21572 REF
                                                  :    Chapter 7
    :
    :
    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT H. HOLBER, CHAPTER 7 TRUSTEE:
OF RED ROCK SERVICES CO., LLC,     :
    :    Adv. Proc. No. 09-2112
            Plaintiff,     :
    :
          v.     :
    :
SUFFOLK CONSTRUCTION COMPANY, INC., :
    :
          Defendant.     :
    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## TRUSTEE'S MCCORMACK DAMAGES CALCULATION

HERRICK, FEINSTEIN LLP
David R. King, Esq.
Aviva Wein, Esq.
210 Carnegie Center, Suite 102
Princeton, New Jersey 08540
(609) 452-3800

### ADDENDUM III
**Trustee's Oral Argument**
**Submission No. II**

| | Trustee's Record Source | Corrected calculation |
|---|---|---|
| McCormack Subcontract | Suffolk should not be permitted to recover against the Estate until the amount of its alleged damages exceeds the amount provided in its schedule of values for demolition — $5,042,479 — or the amount it was paid for demolition by the GSA after change orders — at least $6 million. (Trustee's PFOF No. 223, Lewandowski, T7. 236:9-11). The issue of what figure should be used is a legal issue that is addressed by the Trustee in his post-trial memorandum of law. | $5,042,479.00 |
| Change Orders 1-21 | Suffolk admits that this amount should be reduced to at least $109,394. (See Suffolk's PFOF No. 4). It is the Trustee's position that with the exception of Change Order No. 1, none of the deductive change orders are chargeable against Red Rock. (Trustee's PFOF Nos. 300-306 citing D-1; O'Toole, T3. 134:19-135:8; 135:24-136:17; T3. 132:12-133:25; T3. 134:1-14; 135:15-23; D-33; D-34; O'Toole, T4. 113-7). | ($109,348.00) |
| Paid to Red Rock | No dispute. | ($1,103,454.00) |
| Paid to United Energy | No dispute. | ($130,000.00) |
| Paid to Vendors | No dispute. | ($80,342.66) |
| SCCI payments to RR workforce | No dispute. | ($167,013.64) |
| SCCI payments to RR unions | No dispute. | ($922,731.97) |
| Completion Costs Liberty | NASDI's projected cost to complete all of Red Rock's work should be used as a reasonable calculation of cost to complete Red Rock's work. (McKay, T8. 63:9-18). | $0.00 |
| Completion Costs NASDI | | ($2,234,375.00) |
| Completion Costs Boston Chimney | No dispute. | ($217,980.00) |
| Completion Costs Envirotest | No dispute. | ($135,312.00) |
| Credits set forth above | Scrap revenue due to Red Rock (Trustee's PFOF Nos. 285, 319-325 citing McKay, T8. 52:8-11; O'Toole, T4. 42:24-43:2; 47:3-7; O'Toole, T4. 44:3-6; O'Toole, T3. 31:1-6, D-28; O'Toole T4. 44:7-9; Lewandowski, T7. 256:9-11; Lewandowski, T7. 256:15-22; O'Toole, T4. 45:22-46:2, P-179; P-167; O'Toole, T4. 48:2-17; O'Toole, T4. 49:2-50.7; O'Toole, T4. 53:4-6, O'Toole, T4. 53:7-9; O'Toole, T4. 50:8-21; P-179; P-135; O'Toole, T4. 55:13-58:16). | $428,871.51 |
| | Additional GSA change orders for demolition work (Trustee's PFOF Nos. ¶310-316 citing O'Toole, T4. 61:22-63:11; P-143 at SCCIM0009075; O'Toole, T4. 63:20-25; O'Toole, T4. 64:19-21; P-143 at SCCIM0009075; O'Toole, T4. 63:12-19; O'Toole, T4. 66:4-70:11; O'Toole, T4. 70:23-71:3; P-143 at SCCIM0009077; O'Toole, T4. 72:1-20; O'Toole, T4. 72:21-73:8; P-143 at SCCIM0009069; O'Toole, T4. 73:16-19; O'Toole, T4. 74:8-12; P-143 at SCCIM0009080; O'Toole, T4. 74:13-75:18; O'Toole, T4. 77:20-22; P-148; P- | $175,527 |

| | | |
|---|---|---|
| | 148 at SCCIM0008224; P-190 at SCCIM000048; O'Toole, T4, 83:3-84:1; O'Toole, T4, 84:10-85:20). | |
| OH+P (15%) | Suffolk had no basis for marking up invoices from Liberty or NASDI for work performed within Red Rock's scope of work because Suffolk already had a built in markup. (Trustee's PFOF No. 279 citing McKay, T8, 41:4-42:1; P-180). | $0.00 |
| Suffolk's McCormack Profit | | At least $546,320.24 |

**SUFFOLK CONSTRUCTION COMPANY, INC.**

**McCORMACK ACCOUNTING**

| | | | Record Evidence |
|---|---|---|---|
| **Subcontract** | $ | 3,905,000.00 | J-44 |
| CO 1 | $ | (120,000.00) | D-1 (McCormack RR COs) |
| CO 2 | $ | (1,119.00) | D-1 (McCormack RR COs) |
| CO 3 | $ | (978.00) | D-1 (McCormack RR COs) |
| CO 4 | $ | (1,435.00) | D-1 (McCormack RR COs) |
| CO 5 | $ | (1,210.00) | D-1 (McCormack RR COs) |
| CO 6 | $ | (883.00) | D-1 (McCormack RR COs) |
| CO 7 | $ | (869.00) | D-1 (McCormack RR COs) |
| CO 8 | $ | (4,022.00) | D-1 (McCormack RR COs) |
| CO 9 | $ | (4,267.00) | D-1 (McCormack RR COs) |
| CO 10 | $ | 1,904.00 | D-1 (McCormack RR COs) |
| CO 11 | $ | 4,454.00 | D-1 (McCormack RR COs) |
| CO 12 | $ | 4,591.00 | D-1 (McCormack RR COs) |
| CO 13 | $ | (7,717.00) | D-1 (McCormack RR COs) |
| CO 14 | $ | (1,800.00) | D-1 (McCormack RR COs) |
| CO 15 | $ | (5,410.00) | D-1 (McCormack RR COs) |
| CO 16 | $ | 21,124.00 | D-1 (McCormack RR COs) |
| CO 17 | $ | 4,382.00 | D-1 (McCormack RR COs) |
| CO 18 | $ | (4,627.00) | D-1 (McCormack RR COs) |
| CO 19 | $ | (785.00) | D-1 (McCormack RR COs) |
| CO 20 | $ | (3,025.00) | D-1 (McCormack RR COs) |
| CO 21 | $ | (8,230.00) | D-1 (McCormack RR COs) |
| | | | |
| **Adj Subcontract** | $ | 3,775,078.00 | |
| | | | |
| RR Payments | $ | (1,103,454.00) | D-1 (RR Payments) |
| United Energy Payment | $ | (130,000.00) | D-1 (United Energy) |
| RR Vendor Payments | $ | (80,342.66) | D-1 (Vendor Payments) |
| RR Payroll Payments | $ | (167,013.64) | Stipulated |
| RR Union Benefit Payment | $ | (922,731.97) | Stipulated |
| NASDI Base Subcontract | $ | (1,300,000.00) | D-1 (NASDI) |
| NASDI CO 12 | $ | (207,000.00) | D-1 (NASDI) |
| NASDI CO 39 | $ | (46,672.00) | D-1 (NASDI) |
| NASDI CO 55 | $ | (9,013.00) | D-1 (NASDI) |
| Payments to Liberty | $ | (3,649,224.68) | D-2 & D-3 |
| Liberty extra (PS10) | $ | 2,811.00 | Stipulated |
| Liberty extra (PS13) | $ | 215,262.00 | Stipulated |
| Liberty extra (PS16) | $ | 4,196.00 | Stipulated |
| Liberty extra (PS19) | $ | 12,238.00 | Stipulated |
| Boston Chimney | $ | (217,980.00) | D-1 (Boston Chimney) |
| Envirotest Lab | $ | (135,312.00) | D-1 (Envirotest Lab) |

## ADDENDUM IV
### Suffolk's Oral Argument
### Submission No. II

| | | | |
|---|---|---:|---|
| Liberty Credits | $ | 22,175.08 | Suffolk Proposed Findings of Fact Pages 70-71 P-179 (p. 283-284) less scrap revenue to NASDI (P-167); *see* Suffolk PFOF |
| Scrap Credit | $ | 233,629.44 | Page 71 |
| Incorrect backcharges | $ | 20,574.00 | D-1 (McCormack RR COs - 13, 18, 21) |
| **Subtotal** | $ | **(3,682,780.43)** | |
| 15% OH&P | $ | (552,417.06) | |
| **TOTAL McCORMACK DAMAGES** | $ | **(4,235,197.49)** | |